Greg SMITH, et al., Plaintiffs,

v.

David M. BEASLEY, et al., Defendants,

and

Dewit Williams, et al., Defendant–
Intervenors.

C. Ashley ABLE, et al., Plaintiffs,

v.

David H. WILKINS, et al., Defendants,

Willar H. Hightower, Jr., et al.,
Defendant–Intervenors,

and

United States of America, Defendant–
Intervenor.

Civil Action Nos. 3:95–3235–
O, 3:96–0003–O.

United States District Court,
D. South Carolina,
Columbia Division.

Sept. 27, 1996.

Before CHAPMAN, Senior Circuit Judge, ANDERSON, Joseph F., Jr., District Judge, and PERRY, Senior District Judge.

## ORDER

Presently before the Court are two cases, which have been consolidated for trial by this three-judge panel, because each case challenges on constitutional grounds certain election districts for the South Carolina General Assembly. In *Smith, et al. v. Beasley, et al.,* Civil Action No. 3:95–3235–0, the challenge involves three Senate election districts, and in *Able, et al. v. Wilkins, et al.,* Civil Action No. 3:96–0003–0, the challenge is to nine House of Representative election districts. The contested senatorial districts were created by act of the General Assembly on the

11th day of May, 1995, and approved by the United States Department of Justice after review under section 5 of the Voting Rights Act on the 30th day of May, 1995. The contested House districts were created by act of the General Assembly on the 14th day of May, 1994 and approved by the United States Department of Justice after section 5 review on the 31st day of May, 1994. The plaintiffs in these actions allege that the challenged districts were drawn with race as the predominant factor in violation of *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("*Shaw I*"), and *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). After consolidating these cases, we delayed commencing the trial until the Supreme Court decided *Shaw v. Hunt*, —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"), and *Bush v. Vera*, —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) on June 13, 1996.

The trial of this matter came before this court on August 12, 1994. After hearing over two weeks of testimony, reading numerous depositions, considering scores of exhibits and maps, and reviewing the voluminous stipulations, we make the following Findings of Fact and Conclusions of Law.

## I. JURISDICTION

1. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 2201(a), and the suit is authorized under 42 U.S.C. § 1983. The three-judge panel has been properly appointed by the Chief Judge of the Fourth Circuit Court of Appeals pursuant to 28 U.S.C. § 2284. South Carolina is a covered jurisdiction under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

## II. PARTIES

2. The plaintiffs in the Senate case include at least one registered voter from each of the challenged senatorial districts, being Districts 29, 34, and 37. The plaintiffs in the House case include at least one registered voter from each of the challenged House districts, being Districts 12, 41, 54, 76, 82, 91, 103, 118, and 121. Some of the plaintiffs are African–American, and others are Caucasian.

3. Defendant David M. Beasley is the Governor of South Carolina, and Defendant Robert L. Peeler is the Lieutenant Governor. They are being sued in their representative capacities. Defendant David H. Wilkins is the Speaker of the South Carolina House of Representatives and is a defendant in both suits in his representative capacity to facilitate whatever remedial action may be required.

4. Defendant Marshall Williams was, at the time the Senate action was commenced, the President *Pro Tempore* of the Senate. He died after commencement of the action and has been replaced by his successor, John Drummond.

5. In the House case, the court allowed registered voters from each of the challenged House districts, who are represented by the American Civil Liberties Union (ACLU), to intervene as defendants pursuant to Federal Rule of Civil Procedure 24(b)(2) in order to defend the challenged House districts. In addition, in the Senate case, the court allowed a registered voter from Senate district 37, who is also represented by the ACLU, to intervene so as to defend the challenged Senate districts.

6. On May 3, 1996, the court granted the motion of the United States of America, acting through its Department of Justice, to intervene in the House case pursuant to 42 U.S.C. § 2000h–2.

## III. SOUTH CAROLINA GENERAL ASSEMBLY

7. The South Carolina General Assembly is a bicameral legislative body made up of a 124–member House of Representatives and a 46–member Senate. The term of a Senator is four years and of a Representative two years. Members of both the Senate and the House are elected from single-member districts. During regular elections for both the Senate and the House, every seat is at issue, because there are no staggered terms in either body.

8. Normally, it is the responsibility of the General Assembly, subject to the ap-

proval of the Governor,[1] to redistrict the State Senate and the State House of Representatives. S.C. Const. art. III, § 3. Only when a legislature fails to redistrict according to the federal Constitution and applicable federal statutes in a timely fashion does judicial relief become appropriate. *White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973).

## IV. HISTORY OF STATE LEGISLATIVE REAPPORTIONMENT

9. Prior to the Supreme Court's landmark decision of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which established the "one person, one vote" principle,[2] the county lines of South Carolina's 46 counties defined the electoral districts for both houses of the General Assembly. In the Senate, each county was entitled to one senator. S.C. Const. art. III, § 6. In the House, representatives were apportioned to the counties based on population, but each county, regardless of size, received at least one representative. S.C. Const. art. III, §§ 3, 4.

10. Shortly after *Reynolds v. Sims,* the South Carolina Constitution's method of apportioning the General Assembly was invalidated as violating the one person, one vote principle. *O'Shields v. McNair,* 254 F.Supp. 708, 711 (D.S.C.1966). Thereafter, the General Assembly divided the state along county lines into twenty-seven election districts to be represented by fifty senators. This plan was attacked, and in *State ex rel. McLeod v. West,* 249 S.C. 243, 153 S.E.2d 892 (1967), the South Carolina Supreme Court held that the fifty-member Senate violated Article III, § 6 of the South Carolina Constitution. The *West* court ordered the Senate to reduce its membership to forty-six in time for the 1970 elections. *Id.* 153 S.E.2d at 894. The Senate then enacted a new plan providing for the election of forty-six members from twenty districts.

11. Following the 1970 census, the General Assembly enacted two alternative plans providing for a forty-six member Senate. The plans contained a mixture of single-member and multi-member districts, using county lines as boundaries. The plans also contained a residency requirement such that each county would have a resident Senator. In *McCollum v. West,* Civil Action No. 71–1211 (D.S.C. Apr. 7, 1972), a three-judge panel invalidated these plans for the state Senate, finding the plans violated the one person, one vote standard, and invalidated the residency requirements for certain senators elected from multi-member districts. In 1972, the General Assembly was again redistricted and made specific findings of fact and statements of policy in connection therewith. The first principle provided:

> 1. It is the public policy of this state that counties, as constitutionally recognized political subdivisions of this state, shall be treated as basic units to construct election ... districts for reapportionment of the Senate and it is the public policy of the state that in reapportioning the Senate ... county boundaries should not be disturbed.

12. In 1972, the state devised two new forty-six member Senate plans. The *McCollum* court approved the first of these plans, which provided three single-member districts and thirteen multi-member districts containing from two to five members. In *Burton v. Sheheen,* 793 F.Supp. 1329, 1341 (D.S.C. 1992), *vacated sub nom. Statewide Reapportionment Advisory Comm. v. Theodore,* 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993), the three-judge panel stated:

> Thus, in the quarter century since *Reynolds,* the General Assembly has consistently stated, through its plans and specific statements of policy, that among various state policies, preserving county lines should enjoy a preeminent role in South

---

1. The Governor may sign a redistricting bill or let it become law without his signature. The Governor may also veto such a bill, in which case the General Assembly can attempt to override the veto. To override a veto of the Governor requires a two-thirds vote of both the Senate and the House. S.C. Const. art. IV, § 21.

2. In *Reynolds,* the Court held that both houses of a state's bicameral legislature must be apportioned among election districts of substantially equal population. 377 U.S. at 568, 84 S.Ct. at 1384–85.

Carolina's redistricting process. This preeminence is highly rational.[3]

*Id.* at 1341. The Senate Defendants in the present action disagree with this statement insofar as it applies to redistricting plans enacted after the 1970s.

13. Following the 1980 census, the General Assembly enacted a plan in 1983 (Act 257) creating forty-six single-member districts for the Senate. In so doing, the Senate plan split some counties to comply with the one person, one vote rule that the districts have substantially equal populations.

14. The State of South Carolina brought a declaratory judgment action against the United States in the United States District Court for the District of Columbia seeking a declaration that Act 257 complied with section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. While the action was pending, the State permitted candidates to file for election in the Senate districts created by Act 257. The D.C. court declared these candidate filings null and void and enjoined the State from taking any further action in connection with Senate elections pursuant to Act 257 until the Act received preclearance. *See South Carolina v. United States,* 585 F.Supp. 418 (D.D.C.), *appeal dismissed,* 469 U.S. 875, 105 S.Ct. 285, 83 L.Ed.2d 164 (1984).

15. While this section 5 action was pending in the D.C. Court, a group of plaintiffs brought suit in the United States District Court for the District of South Carolina seeking to have the court impose a Senate redistricting plan for use in the 1984 elections. *Graham v. South Carolina,* Civil Action No. 3:84–1430–15 (D.S.C. June 13, 1984). On motion of the United States, the United States District Court for the District of Columbia issued an injunction against the state prohibiting it from asking the *Graham* court to implement Act 257 or any unprecleared portion of that plan as a remedy in *Graham. South Carolina v. United States,* 589 F.Supp. 757 (D.D.C.1984).

16. The *Graham* court then drew an interim redistricting plan for the Senate, which contained forty-six single-member districts and in doing so split twenty-six of the state's forty-six counties. Of the forty-six districts, nine had a black population majority.

17. In 1984, the General Assembly passed S.A. 513, the Senate redistricting plan, to replace the interim plan of the *Graham* court. This plan created ten black majority districts in terms of total population. Seven of these ten districts had a black majority in terms of voting-age population.

18. Between 1887 and 1983, no black Senators were elected to the South Carolina Senate. In 1983, one black Senator was elected in a special election in District 7, which comprised parts of Chester, Fairfield, and Richland Counties. Under the 1984 plan, four black Senators were elected from Districts 7, 19, 39, and 42. In the 1988 general election, a fifth black Senator was elected from District 30, and, in a special election in 1990, a sixth black Senator was elected to represent District 45.

19. In 1981, the House obtained ratification of a reapportionment plan without judicial intervention. The plan was precleared by the Department of Justice and used continuously until the 1990 census.

By the time of the 1990 census, both the Senate and the House had sophisticated computer software and highly trained technicians to facilitate the reapportionment process. In addition, subcommittees on reapportionment were appointed to study issues exclusively related to redistricting and to fashion plans on behalf of the Senate and the House.

20. The 1990 census found South Carolina's population to be 3,486,703, resulting in an ideal Senate district population of 75,798 and an ideal House district population of 28,119. The census also revealed that the existing districts for both the Senate and the House had become substantially unequal in population.

The Senate Judiciary Committee's Subcommittee on Redistricting and Reapportionment held public hearings to obtain the views

---

**3.** There are no South Carolina constitutional or statutory prohibitions against splitting municipal boundaries or requiring that municipal boundaries be followed in drawing state legislative districts. Likewise, there are no legal prohibitions against splitting precinct boundaries or requirements that precinct boundaries be followed in drawing district lines.

of citizens and interested groups regarding redistricting. On April 29, 1991, the Subcommittee adopted guidelines for use in formulating redistricting plans. These guidelines applied to legislative and congressional redistricting and provided:

### I. EQUAL POPULATION

Equality of population of legislative and congressional districts insofar as is practicable is the goal of reapportionment and redistricting.

A. Legislative districts will be drawn to achieve substantial equality of population among the various districts.

1. As a general proposition, deviations from the "ideal district" population should be justified either as a result of the limitations of census geography, or as a result of the promotion of a rational state policy.

2. In any case, the relative population deviation for any legislative district should not exceed plus or minus 2%.

3. Deviations from the "ideal district" population which would create any district(s) with relative deviation outside plus or minus 2% or an overall deviation greater than 4% must be clearly justifiable as a result of the promotion of a rational state policy or compliance with the Voting Rights Act.

B. Congressional districts [not applicable to this litigation.] . . .

### II. VOTING RIGHTS ACT

A redistricting plan for the General Assembly or Congress should not have either the purpose or the effect of diluting minority voting strength and should otherwise comply with Sections 2 and 5 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

### III. CONTIGUITY

All legislative and congressional districts will be composed of contiguous geography. Contiguity by water is acceptable to link territory within a district provided that there is a reasonable opportunity to travel within the district and the linkage is designed to meet the other criteria stated herein.

### IV. COMMUNITIES OF INTEREST

When possible, legislative and congressional districts should attempt to preserve communities of interest where such efforts do not violate Criteria I and II.

### V. CONSTITUENT CONSISTENCY

Efforts will be made to preserve cores of existing districts where such efforts are consistent with and do not violate Criteria I and II.

### VI. PRECINCT BOUNDARY LINES

District boundaries should adhere to voting precinct boundary lines, as represented by the Census Bureau's Voting Tabulation District (VTD) Lines, in order to minimize voter confusion and cost of election administration. Pending precinct boundary line realignments should be considered.

### VII. DATA

The total state population and the population of the defined subunits thereof, as reported by the 1990 Federal Decennial Census shall be the exclusive permissible data base used for the development, evaluation, and analysis of proposed redistricting plans.

### VIII. COMPACTNESS

All legislative and congressional districts should be reasonably compact. Irregular district shapes may be justified because the district line follows a significant geographic feature or political subdivision boundary or promotes Criteria I and II.[4]

21. The General Assembly did not pass a redistricting bill before adjournment of the 1990–91 legislative session. The Senate had passed S.1003, its own redistricting bill, and the House had passed H.3834 to redistrict itself. However, neither body had approved the other's plan before adjournment *sine die*, which, by law, must occur not later than 5:00 p.m. on the first Thursday in June. As a general rule, there has been an understand-

---

4. After the Supreme Court's decision in *Shaw I,* which held that bizarrely shaped districts provide circumstantial evidence of unconstitutional racial gerrymandering, the Subcommittee on March 30, 1994 adopted new redistricting criteria. The only amendment from the earlier version is in section VIII. Compactness. *See* Stip. Ex. J, at 3–5.

ing between the two bodies that neither will interfere with the redistricting of the other.

22. On October 4, 1991, the South Carolina Republican Party instituted an action entitled *Michael G. Burton, et al. v. Robert J. Sheheen,* (D.S.C.), alleging that the electoral districts for the House, the Senate, and South Carolina's congressional representatives were malapportioned in violation of the Equal Protection Clause and the Voting Rights Act, 42 U.S.C. § 1973 *et seq.* Shortly thereafter, the Statewide Reapportionment Advisory Committee (SRAC) and others also filed suit claiming the districts were malapportioned. The SRAC case was consolidated with *Burton* on November 13, 1991.

23. In January 1992, with the *Burton/SRAC* litigation pending, the General Assembly passed both S.1003 and H.3834, but the Governor vetoed both bills on January 29, 1992. In the veto message of the Senate's plan, the Governor expressed his opinion that the legislature's action was motivated by a desire to keep incumbents in office at the expense of fairer minority representation; that he was convinced the Department of Justice would not preclear the plan under section 5 of the Voting Rights Act; that the Senate plan did not create any open minority districts where a minority candidate would not face the task of challenging a white incumbent; and that several proposed districts shared little commonality or compactness. He suggested additional majority-minority Senate districts in the Savannah River Valley region between Aiken and Anderson; in the area of Georgetown, upper Charleston, Williamsburg, and Marion Counties; and an additional district in Union, Spartanburg, York, and Chester Counties.

24. In his veto message of the House plan, the Governor again expressed his opinion that the legislation was motivated by a desire to keep incumbents in office at the expense of fairer minority representation; that minority populations had been fractured to benefit white incumbents; and that minority districts were intentionally not drawn in order to further some political purpose. He specifically called attention to eight areas in which he felt minority districts could be established.

25. The legislature sustained the Governor's veto, and neither the House nor the Senate revised its respective redistricting plan. Accordingly, the trial in the *Burton/SRAC* litigation commenced in February 1992. At trial, SRAC advocated a Senate plan to create fourteen black majority districts, twelve of which would have a majority of black voting-age population (BVAP). Governor Campbell proposed a Senate plan that would create thirteen black majority districts, twelve of which had a majority BVAP. The Governor's plan also pitted five pairs of incumbent Democratic senators against each other in the same districts. The South Carolina Republican Party advocated a plan which, like the SRAC plan, created fourteen black majority districts, thirteen of which had a majority BVAP.

26. The three-judge panel in *Burton* issued its order on April 1, 1992, promulgating its redistricting plan for the House, Senate, and Congress. *See Burton v. Sheheen,* 793 F.Supp. 1329 (D.S.C.1992). The *Burton* court plan created eleven black majority districts, ten of which had a majority BVAP. The court indicated that its plan had a *de minimis* deviation range of 1.95%. It also stated: "In fashioning relief ... the court must be cognizant of § 5 concerns that voting changes have neither the 'purpose ... [nor] the affect of denying or abridging the right to vote on the basis of race.'" *Id.* at 1345 (quoting 42 U.S.C. § 1973c). The court further observed that it was "not obligated to completely import the standards and requirements of § 2 [of the Voting Rights Act] into a proceeding under § 5." *Id.* at 1351.

27. The *Burton* court noted that the parties had stipulated that "since 1984 there is evidence of racially polarized voting in South Carolina." *Id.* at 1357–58. The *Burton* court explained, "The only cognizable state policy [it] considered [in formulating its plan] was the preservation of county lines." *Id.* at 1360. But, the court split twenty-seven (59%) of the state's forty-six counties. Under the court's plan, seven black Senators were elected in 1992. They were from Districts 7, 19, 21, 30, 39, 42, and 45. In 1995, the black incumbent senator from District 7 was expelled, and in a special election to fill

the vacancy, a white candidate won. Presently, there are six black senators in the General Assembly.

28. No black has ever been elected to the Senate from a majority-white district, except Isaiah DeQuincey Newman, who was elected in 1983 in a special election to represent the Chester–Fairfield–Richland multi-member district. Only two black Senators have ever been elected from a white majority VAP district: Senator Newman and Senator Theo Mitchell.

29. No black has been elected to represent Senate Districts 29 or 37 under the *Burton* court plan or the areas contained within those districts. Senate Districts 32 and 36 under the court plan both have white incumbents; both districts have higher BVAPs than either of the new BVAP majority districts in S.9 (Senate Districts 29 and 37).

30. Under the court plan, seventeen counties currently do not have a resident senator.

31. The Governor and SRAC appealed the decision in *Burton v. Sheheen* to the United States Supreme Court. The Solicitor General of the United States filed a brief as *amicus curiae* in the *Burton* appeal. In June 1993, the Supreme Court vacated the *Burton* court plan and remanded the case "for further consideration in light of the position presented by the Solicitor General in his brief for the United States." *Statewide Reapportionment Advisory Comm. v. Theodore,* 508 U.S. 968, 968, 113 S.Ct. 2954, 2954, 125 L.Ed.2d 656 (1993).

32. The Solicitor General's brief in *Burton* argued that the district court had not given adequate consideration to the requirements of section 2 of the Voting Rights Act in imposing its redistricting plan. The Solicitor General argued that the district court erred in viewing the litigation as arising under section 5 of the Act, which covers preclearance, instead of section 2 of the Act. According to the Solicitor General, because the *Burton* plaintiffs alleged that the existing election districts violated both section 2 and the United States Constitution, the court was required to ensure that any plan it adopted complied in all respects with section 2. The Solicitor General also argued that the court refused to resolve the issue of racially polarized voting and did not respond adequately to the question of whether additional compact and contiguous districts with black majorities could and should have been created in disputed areas to avoid dilution in voting strength in violation of section 2. In addition, the Solicitor General contended there was no basis for the court's finding that any district in which blacks constitute more than 50% of the voting age population may be considered a "black opportunity district." Finally, the Solicitor General also contended that the *Burton* court appeared to have given undue deference to "state policy" in formulating its plans with primary emphasis on preserving county and precinct lines.

33. On remand, the *Burton* court gave the General Assembly an opportunity to pass and obtain preclearance of new redistricting plans for both the House and the Senate. In January 1994, the House passed H.4333, which became R.287 when passed by the Senate. This plan became law on February 15, 1994, without the signature of Governor Campbell, who advised the legislature that the plan failed to create additional districts in which racial minorities would have an equal opportunity to participate in elections and to elect candidates of their choice. He again called attention to specific areas in which he felt majority-minority districts could be created and also called attention to areas in which he felt minority voting populations had been fractured. The Governor stated that rather than veto the law, he would allow it to go to the Department of Justice for analysis under the Voting Rights Act, where he felt it would be rejected.

34. On May 2, 1994, the Department of Justice formally objected to the House plan of Act R. 287 in a letter to then-Speaker of the House, Robert J. Sheheen. In its letter, the Department of Justice objected to the House plan "because of the concerns relating to the proposed configurations for the areas identified [in the letter]." The nine areas identified by the DOJ were Marlboro and Dillon Counties; Clarendon, Williamsburg, and Georgetown Counties; Charleston County; Colleton, Beaufort, Jasper, and Hampton

Counties; Richland County; Fairfield and Chester Counties; Allendale, Bamberg, and Barnwell Counties; Edgefield, Saluda, and Aiken Counties; and McCormick, Greenwood, and Abbeville Counties. The DOJ concluded that the General Assembly had failed to prove, as required by section 5 of the Voting Rights Act, that the House plan was free of discriminatory purpose and discriminatory effect. In reaching this conclusion, the Department of Justice stated that "legislative elections throughout the state are characterized by a pattern of racially polarized voting."

35. The Statewide Reapportionment Advisory Committee (SRAC) is an advocacy group for minorities in South Carolina. During the reapportionment process, SRAC worked closely with the Black Caucus of the South Carolina General Assembly. For a number of years, Dr. John Ruoff has been acting as a demographer, advisor and lobbyist for SRAC and the South Carolina Black Legislative Caucus. He testified as an expert in *Burton* and has been in contact with various officials of the Department of Justice over the years in pursuing the goals of SRAC and the Black Caucus. He has testified as a plaintiff's expert in a number of section 2 voting rights cases. In his *Burton* testimony, he was of the opinion that thirty-eight House districts could be created with a bare majority of black population, but the maximum number of electable majority-minority districts was thirty-two. Although his proposed plan was rejected by the *Burton* court, he continued to work with SRAC, the ACLU, and the NAACP on his "dream plan" to establish thirty-two districts in the House with a black population of 57% or more. He referred to such districts as "super majority districts" and stated that black candidates won 85% of the time in such districts. Of the thirty-two black-majority districts created in the May 1994 plan (the one now under attack), all but four have a total black population of at least 57%. Dr. Ruoff identified election districts with 50% to 57% black population as "phantom districts," and districts of 25% to 50% black population he called "influence districts."

36. In December 1993, Dr. Ruoff prepared Plan A for the South Carolina Legislative Black Caucus. That plan included thirty-two districts with a majority BVAP and created new black-majority districts in District 12 (McCormick–Greenwood), District 54 (Marlboro–Dillon), District 76 (Richland County), District 82 (Edgefield–Aiken), District 91 (Allendale–Barnwell–Bamberg), District 118 (Charleston County), and District 121 (Colleton–Beaufort). In addition, the plan strengthened to greater than 50% BVAP District 93 (Calhoun–Orangeburg), District 103 (Williamsburg–Georgetown–Horry), and District 109 (Charleston). The plan also increased to greater than 57% the BVAP in District 41 (Fairfield–Chester). According to Ruoff's summary of the plan, it eliminated the "phantom" districts, District 90 (Bamberg–Colleton) and District 110 (Charleston), which under the *Burton* court plan were majority-minority districts in terms of total population, but had less than 50% BVAP. The plan used black population from those two districts to enhance black percentages in other districts. Ruoff's Plan A contained 222 split precincts in his plan, 18 less than H.4333, but the plan split more counties than H.4333, leaving only two unsplit.

37. Dr. Ruoff regularly reported to Representative Don Beatty of Spartanburg County, who was the member of the Black Caucus managing the effort to obtain additional African–American districts. Ruoff also reported on a regular basis to other members of the Black Caucus, as well as to officials of the NAACP and the ACLU.

38. In addition, Dr. Ruoff maintained regular contact with various attorneys in the Voting Rights Section of the Civil Rights Division of the Department of Justice to report his progress and obtain recommendations on his efforts to secure the enactment of his "dream plan."

39. During the 1993–94 session of the General Assembly, the Black Caucus was concerned with increasing its influence on legislation being considered. A majority of the caucus felt that this objective could best be obtained by increasing the number of African–American members in the House and the Senate. A small minority of the

Caucus preferred to go along with a number of white Democrats who argued that black influence was most effective when the BVAP in an election district was 30 to 35%. It was argued that with this substantial minority, an elected official, black or white, would listen to and usually seek to accommodate the minorities' demands. The majority of the Black Caucus believed that the black population was underrepresented and that the 30 to 35% minority BVAP districts ensured white Democrats control of the General Assembly. In such districts white Democratic candidates could usually defeat black candidates in the primary elections and then use the blacks, who usually voted for the Democratic Party candidate in the general election, to hold off a Republican challenge.

40. The Republican members of the General Assembly also felt that those citizens who identified themselves with the Republican Party were underrepresented. Although the black Democrats and the Republicans had not been political allies on other issues, they began to explore the mutual benefits that might be gained by joining forces in an effort to redraw certain district lines.

41. Representative Don Beatty became the point man for the Black Caucus, and Mark Elam, Chief Counsel to Governor Carroll Campbell, was the primary negotiator for the Republicans. Previously, the reapportionment process for the House had been controlled by Speaker Sheheen, who had not only the power of his personality and office, but also an intimate knowledge of the computers and computer programs kept in the "map room" of the House. Although there were two other House employees working with these computers, the Speaker controlled access to the map room, and House members could visit the room only with his permission, and usually in his presence. If a member wished to consider a change in his or her district, the Speaker would operate the computer and explain why such change could or could not be made.

42. Both the Senate and the House had sophisticated computer equipment that was maintained for the purpose of drawing election district lines. These machines were equipped with software that showed pre-cincts, streets, population and racial composition of all areas based on the 1990 federal census data base. Technicians could show legislators how moving district lines could increase or decrease the racial makeup of a particular district.

43. After the Supreme Court remanded *Burton*, the three-judge panel directed the General Assembly to try again to adopt a reapportionment plan and set a deadline for the House of April 1, 1994, later extended to June 1994. If the legislative plan was not adopted and had not been precleared by such date, the court would direct the use of its own plan.

44. In January 1994, the House began the reapportionment process. The Speaker had prefiled H.4333, which was similar to the *Burton* court plan. Representative Beatty received from John Ruoff the SRAC revised plan, known as Caucus Plan A, which contained 32 districts with 50% or more BVAP. This plan was presented by Representative Beatty to the House Judiciary Committee as an amendment to H.4333. At the Committee's meeting on January 18, 1994, Representative Beatty was asked to what degree his amendment considered "the issue of county lines or communities of interest." He responded:

> There was consideration given to these points and we know that they are important. But we thought there was a prevailing interest, a priority higher than that and that is to be representative of the state population. And to be quite frank with you, the new district was drawn on that basis alone.

Pls.Ex. 72, at 13–14.

45. Beatty's effort to amend H.4333 failed, and the bill passed the House and the Senate. Under H.4333, the number of black-majority districts was reduced from twenty-eight, under the *Burton* court plan, to twenty-seven. This decrease was the result of an amendment to accommodate Representative Juanita White's request that her district, District 122, have its black population increased. This was accomplished by reducing the black population in District 120, which had been a bare majority-black district, to

47.8%. The black population in Mrs. White's district was increased from 52% to 59%, and Representative White advised the Department of Justice that these changes were made at her request.

46. Governor Campbell did not veto H.4333, but allowed it to become law without his signature. He advised the Speaker of the House by letter that H.4333 did not create enough black-majority districts and predicted that the plan would not obtain section 5 preclearance from the Department of Justice. Speaker Sheheen submitted the new House reapportionment plan to the Department of Justice for consideration under section 5 of the Voting Rights Act on March 23, 1994.

47. While the Department of Justice was considering H.4333, its attorneys were in constant contact with Representative Beatty, John Ruoff, Laughlin McDonald of the ACLU, and representatives of the NAACP. Notes taken by Department of Justice attorneys of telephone conversations reflect that race was not just the predominant issue discussed, but the only issue involved in these conversations. All of these communications related to creating new districts with a sufficient BVAP to guarantee the election of black candidates. On April 21, 1994, attorneys for the DOJ met with Ruoff and Beatty. Notes of this meeting reflect that the issues discussed were the creation of additional safe black seats in Charleston County, Richland County, McCormick–Greenwood Counties, and Chester–Fairfield Counties. Attending these meetings for DOJ were attorneys handling the preclearance, including Mark A. Posner of the Coordination and Review Section of the Civil Rights Division, and Deval Patrick, Assistant Attorney General in charge of the Civil Rights Division. Ruoff and Beatty were seeking to have the House plan rejected by DOJ and also to have DOJ insist upon the creation of new majority-black districts in the areas set forth in Ruoff's dream plan.

48. On the same day, the same DOJ attorneys met with Mark Elam, Robert Hunter of the Washington firm of Patton, Boggs and Blow, and other attorneys representing the South Carolina Republican Party and the Governor of South Carolina. These individuals were also seeking the rejection of H.4333 and the creation of new black majority districts in the same areas as were Ruoff and Beatty. At this meeting, Attorney Hunter hand delivered to Steven Rosenbaum, Chief of the Voting Rights Section of the Civil Rights Division, a letter written by him as attorney for the Governor of South Carolina asking that H.4333 be rejected. This letter included a copy of the Governor's January 29, 1992 veto letter to Speaker Sheheen in which the Governor called for the creation of additional black-majority districts in Richland, Charleston, Greenville, and Beaufort Counties, Colleton–Hampton County, Georgetown County and McCormick–Greenwood Counties. Attorney Hunter's letter also sought proportional representation by race.[5] He indicated that as many as thirty-six minority districts could be created and called attention to the fact that the court plan contained only twenty-eight. He stated:

> However, a chief flaw in this accounting is the concept that any district with a bare majority black voting age population gives the black community an election opportunity. Many of these seats are not "effective." Even using these flawed raw totals, only if the 1980 plan is used as the benchmark, is the House plan not retrogressive, if any other benchmark is used it is clearly retrogressive and should not be precleared.

South Carolina's black population is 29.71% of its total population and black

---

5. During the reapportionment process, the Black Caucus was also advocating proportional representation for South Carolina's African–American citizens. This position is reflected in statements in the House Journal following the vote on H.4333 on January 26, 1994. Representative Lucille Whipper, a black legislator from District 109 in Charleston County, stated, "blacks should have the opportunity to serve in elected positions in proportion to their [Democratic] party membership, or most importantly, on the basis of their percentage in the general population." Def.–Int. U.S.'s Ex. 42, at 1257. Similarly, Representative Joe Brown, then-Chariman of the South Carolina Legislative Black Caucus, stated, "One-third of our state's population should have no difficulty garnering at least one-third of the seats in the General Assembly. Any other alternative is unacceptable." Id. at 1259.

voting registration of approximately 26% of all registered voters. Therefore, a fairly drawn plan of reapportionment should set a goal of creating approximately 33 to 37 election opportunities in the 124 member House of Representatives for minority communities. This goal is not achieved by the House plan, in large part, in order to protect white, Democrat incumbents.

.... Every ten-years, the job of the legislature is to make changes in the representation plan that reflect the political makeup of the state as shown by the census. A plan that does not reflect the political complexion of the state does not achieve this goal.

Pls.Ex. 40, at 2.

49. Attorney Hunter's letter urged DOJ to act before the next status conference to be held by the *Burton* three-judge panel. The letter states:

As you are aware, the Governor, along with others, has been engaged in a lengthy court battle concerning this plan. We urge your Department to quickly conclude its review of the proposed plan and to send a letter objecting to the House plan as soon as practicable, but not later than May 3, 1994, when the U.S. District Court will want another status report on this matter. It is *very* important that your objection letter list the specific areas of the State of South Carolina where additional minority districts could be drawn. Governor Campbell's veto message and his message allowing the enactment to go into law contain lists of specific areas in South Carolina where these districts can be created. Governor Campbell allowed this measure to pass into law, largely, at the urging of minority legislators, who believed that they would receive a fairer result before the Justice Department than they would before the three-judge panel.

Pls.Ex. 40, at 3.

50. It is obvious from the notes of telephone conversations, memoranda, correspondence, and testimony presented that the Black Caucus, the South Carolina Republican Party, and the Department of Justice were seeking to maximize black representation in the South Carolina House of Representatives

with little concern for compactness of districts, contiguity, or communities of interest. Proportionality was the aim as reflected in Attorney Hunter's letter that the reapportionment goal should be approximately thirty-three to thirty-seven election opportunities in the 124–member House. This would be proportional to the 26% black registered voters in the state and 29.71% total black population. Of course, the correspondence, telephone notes, etc. were generated before the decisions in *Miller v. Johnson* and *Shaw v. Hunt, supra,* and the statements made in the spring of 1994 are much more persuasive to the court than those heard at trial, when witnesses were trying to explain their prior words and actions in light of *Miller* and *Shaw II.*

51. Deval Patrick, Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice, testified by deposition. He had attended the meetings with Beatty and Ruoff on April 21, 1994 and also with representatives of the Governor and the Republican Party on the same day. He remembered little about the meetings, but as to reapportionment and the shape or configuration of districts, he stated: "I don't think there is any such thing as a bizarre or irregular shape." He also stated that the Department of Justice in a section 5 review could consider whether a proposed majority-minority district had a viable black candidate.

52. On May 2, 1994, Assistant Attorney General Patrick, in a ten-page letter to Speaker Sheheen, denied preclearance of H.4333. This letter was issued, as requested by Attorney Hunter, prior to the status report to the *Burton* three-judge panel. The letter went into great detail in explaining the areas in which additional black majority districts could be created. This was in keeping with the "dream plan" of Ruoff and the Governor's veto message. The rejection letter makes no mention of compactness or communities of interest; every comment relates to the racial composition of the areas in which DOJ desired majority-minority areas to be created. These are as follows:

### Charleston County

The proposed plan, in Charleston County, includes three districts with black voting age population majorities (excluding military population), all of which are represented by black legislators (Districts 109, 111, and 116). Proposed Districts 111 and 116 appear to have substantial black registration majorities. District 109, however, appears to have a slight white registration majority and also includes a white population growth area. There is a fourth district (District 110) that has a black population majority but is only 44 percent blacks in voting age population. Immediately adjacent to Districts 109 and 111 (to the north, south, and southwest) there are significant black concentrations which are fragmented among District 110 and two white-majority districts (Districts 118 and 119). The state has offered no adequate explanation for this fragmentation which, if cured, would result in the creation of four districts in the county with black voting age population and registration majorities in which black voters would have a realistic electoral opportunity.

### Richland County

In Richland County, the state similarly has unnecessarily fragmented black population among white-majority districts, again apparently to protect white incumbents. The county includes four black voting age population majority districts that have elected black representatives. Three of these districts (Districts 77, 73, and 74) are contiguous, aligned on a north-south axis, but to their west and south black population is fragmented into two white-majority districts (Districts 72 and 75). It also appears that, to some extent, black population has been unnecessarily packed in Districts 77, 73, and 74. By remedying this fragmentation and lessening to some extent the black concentrations in these three districts, a fifth black majority district may be drawn with a black voting age population percentage greater than 55 percent.

### Fairfield and Chester Counties

Fairfield and Chester Counties are located immediately to the north of Richland County. Proposed District 41, which includes all of Fairfield County and reaches north to include a portion of Chester County and the City of Chester, has a bare black voting age population majority (51 percent) and appears to be majority white in voter registration. By combining Fairfield Count (54 percent black in voting age population) with the City of Chester's black population, the state has created a configuration that has the potential to yield a district with a significant black voting age population majority in this area of the state. However, the black population percentage in District 41 is minimized by drawing the district to the City of Chester through the more heavily white south-central and southeastern portions of Chester County rather than through the southwestern portion of the county where black concentrations are located. The state also includes in the district a majority white area on the eastern side of Fairfield County. The state has not offered an adequate explanation for rejecting proposed alternatives which avoid this minimization of black voting strength.

### Clarendon, Williamsburg, and Georgetown Counties

These three counties occupy a rural area of the state located along an east-west axis from the coast to Richland County. From west to east, the proposed plan includes Districts 64, 101, 103, and 108 in this area. District 101 (located principally in Williamsburg County) is 60 percent black in voting age population in the existing plan and is increased to 65 percent black in voting age population in the proposed plan. In 1992, the current black representative defeated a white candidate in a close and racially polarized Democratic primary election. Existing Districts 64 and 103, located to the west and east of District 101, have bare black voting age population majorities but these majorities are eliminated in the proposed plan. Finally, District 108 is a white-majority district.

Our analysis indicates that the elimination of the black voting age population majorities in Districts 64 and 103 violates the nonretrogression requirement of Section 5. *Beer v. United States,* [425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976)].

While we understand that the reductions were occasioned by an effort to increase the black percentage in District 101, it appears that this goal could have been achieved without reducing the black percentages in Districts 64 and 103, by making other adjustments in the configurations of the latter districts. In particular, with respect to District 103, the proposed plan places a significant concentration of black population—located in the City of Georgetown—just outside the district on the border with District 108. The state has not explained why it excluded the black population in the City of Georgetown from District 103. Alternatives rejected by the House, which avoided this fragmentation, drew District 103 at above 55 percent black in voting age population.

*Allendale, Bamberg, and Barnwell Counties*

Allendale County has the highest black percentage among South Carolina counties (63 percent black in voting age population). While the proposed plan places most of the county in District 91, the black population in the eastern corner of the county is fragmented into District 90, which also involves the division of the towns of Allendale and Fairfax between the two districts. In addition, at the northern end of the two districts, there is a band of black population that runs from west to east which is fragmented between the two districts. As a result of this configuration, neither district has a black voting age population majority although both are over 40 percent black in voting age population. Alternative plans rejected by the legislature retain all of Allendale County in District 91, and also offer the possibility of lessening the fragmentation at the northern end of the districts. Again, the state has not offered an adequate explanation for rejecting these alternatives.

*Edgefield, Saluda, and Aiken Counties*

To the northwest of District 91 is proposed District 82 (37 percent black in voting age population), which includes all of Edgefield County and a portion of Aiken County to the east. The state drew District 82 to skirt the black concentrations

located in the northern portion of the City of Aiken. In addition, by following the county line between Edgefield and Saluda Counties, the district (on its northern side) appears artificially to fragment a black population concentration located on both sides of the county line. An alternative plan rejected by the House would have modified the Aiken County portion of the district to include black population in the City of Aiken and also minimized the fragmentation on the northern border of the district, thus occasioning a district that is over 55 percent black in voting age population. This alternative configuration appears to more fairly reflect black voting strength in this area, and the state has not justified its proposed configuration.

*McCormick, Greenwood, and Abbeville Counties*

Adjacent to District 91, to the northwest, is proposed District 12 (36 percent black in voting age population). This district includes all of McCormick County, a substantial portion of Greenwood County (including a portion of the City of Greenwood), and also a small portion of Saluda County. Alternative plans rejected by the House demonstrated that an additional district with a black voting age population majority over 55 percent may be drawn in this area of the state. This apparently would involve extending District 12 into Abbeville County to include black populations in the towns of Abbeville and Calhoun Falls, removing rural areas in Greenwood and Saluda Counties, while retaining the black population in the City of Greenwood. The state has not provided an adequate explanation of the reasons for adopting its proposed configuration, and thus we are unable to conclude that the state has met its Section 5 burden in this portion of the plan either.

*Colleton, Beaufort, Jasper, and Hampton Counties*

This four-county area occupies the southern tip of the state below the City of Charleston. In the existing and proposed plans, this area includes five whole districts. In the existing plan, two of the districts (Districts 120 and 122) have black

voting age population majorities (excluding military population). District 122, which is 53 percent black in registration, includes a large development projected to be occupied primarily by white population. We have been advised that to compensate for this latter circumstance, the proposed plan increases the black percentage in District 122 by transferring black population from District 120, thus making District 120 a white-majority district.

As in the Clarendon/Williamsburg/Georgetown area, however, our analysis indicates that the goal of increasing the black percentage in District 122 could have been achieved without occasioning a retrogression in black voting strength which occurs by eliminating from this area a second district with a black voting age population majority. Specifically, it appears that there are significant black concentrations located roughly along the eastern side of this area in Colleton County and in the Cities of Beaufort and Port Royal in Beaufort County. The proposed plan appears to fragment unnecessarily this population among Districts 120, 121, 66, and 124.

*Marlboro and Dillon Counties*

In the northeastern part of the state, the proposed plan draws District 54, which includes almost all of Marlboro County, and District 55, which includes almost all of Dillon County. Each district has a substantial black minority population (46 percent and 37 percent black in voting age population, respectively). Significant black concentrations are located in the largest town of each county, Bennettsville in Marlboro and Dillon in Dillon County. An alternative plan rejected by the House demonstrated that a compact district with a black voting age population majority may be configured in this area (by linking the Cities of Bennettsville and Dillon). The state has not provided an adequate explanation for its proposed configuration and thus we are unable to conclude that the state has met its Section 5 burden.

Pl.Ex. 1, at 5–8.

52. The alternative plan referred to throughout this letter is the Black Caucus Plan A, which was presented by Representative Beatty to the House Judiciary Committee in January 1994.

53. Mark Elam, Chief Counsel to Governor Campbell, and the primary negotiator for the Republicans in dealing with the Black Caucus to create the present plan, testified that the DOJ letter of May 2, 1994 rejecting H.4333 was the impetus for the Republicans and the Black Caucus to cooperate in the presentation of their joint plan, which became known as the Beatty–Clyborne Amendment. Although Representative Clyborne's name is on the amendment, he had very little to do with drawing the lines of the nine districts now in dispute (Districts 12, 41, 54, 76, 82, 91, 103, 118, and 121). Preparation of the maps showing the lines for these districts was done primarily by Ruoff and Elam, but the basic concept for the challenged district goes back to Ruoff's original "dream plan." When asked about communities of interest within these districts, Elam testified that his knowledge of the State of South Carolina supplied this element.

54. The Beatty–Clyborne Amendment came before the House of Representatives as a result of a parliamentary procedure in which Representative Beatty challenged a ruling of Speaker Sheheen by appealing to the full membership of the House. When it became apparent that the coalition of the Black Caucus and the Republicans had sufficient votes to overrule the Speaker, the bill was allowed to come on for a vote. Representative Beatty presented the bill to the House and in doing so stated, in part:

> Considering that no one is really interested in clarity, I'm going to leave this amendment up here and I'm not going to answer any questions on it. I want to call it to vote. Well, let me tell you this. This amendment creates nine new districts and it complies fully with the Justice Department's objections. They've asked me to give some further clarification. I said nine new districts. The Speaker would prefer, and he's probably correct, that I say we create new districts and increase percentages in others. However, without ques-

tion, it complies with the Justice Department's objections.

Pls.Ex. 71, at 2.

In discussing the districts, he stated:

Greenwood, McCormick, Saluda. District 12, Representative McAbee becomes a 65 percent black district. District 12 takes Abbeville 2 from Abbeville County. Additionally the district also picks up black population from within and around the City of Greenwood.

*Id.* at 4–5.

As to District 41, he stated:

There's an amendment for Fairfield/Chester and I do understand there will be another one coming from the floor, the District 41 Wilkes' district is increased from 56 percent black population to 62 percent black population. New district 41 has the rest of Fairfield County and southwest corner of Chester County. District 41 takes part of Eureka Mill[ ], part of Chester Ward 3, and all of [Halsellville] in Chester County. Additionally, other areas of strong minority concentration in and around the City of Chester are taken by District 41.

*Id.* at 3.

As to District 54, his comments were:

The Dillon/Marlboro area, District 54 which belongs to Representative Jennings, I do believe, is increased from 49 percent black population to 64 percent black population. We make it a viable minority district. The change is accomplished by swapping several precincts with District 55, which is Representative [Kinon's] district, which is now 30 percent black and District 53, ... which is now 31 percent black. District 54 takes in [Minturn], Little Rock, West Dillon, South Dillon and part of [Mt.] Calvary. District 55 takes [McColl], Tatterly [sic], Adamsville, Brightsville, Wallace, and parts of [Clio] and Quick Cross Roads. District 54 also takes the black population in the City of Cheraw from District 53.

*Id.* at 3–4.

As to District 76, Representative Beatty stated:

Changes in Richland [County] create a new 61 percent black minority district [76] along the Two Notch Road/Dentsville area and strengthen the previous minority district in District 70, Representative Neil [sic], will increase his numbers. District 72 also loses certain precincts to strengthen the minority District 74, Representative Burg. Our [voters analysis] indicate[s] that those precincts were not kind to us. The result of that District 74 is now 66 percent black district. Additionally, Olympia precinct is split between District 70 and District 72. Additionally the Bluff Road Precinct is moved from District 80, Bubba Cromer, to District 70 adding a minority voting strength to that district.

*Id.* at 7.

He stated as to the new District 82:

Edgefield/Aiken. District 82, Representative Stone's district, we make that a black majority district. We increase that percentage to 63 percent. District 82 picks up Pleasant Cross, Ridge Spring[ ] and [Fruit Hill] in Saluda Counties, and Aiken 2 and part of Aiken 3 and Aiken 4 and Six Points.

*Id.* at 6.

As to District 91, he stated:

Allendale, Barnwell, Bamberg. These changes create an electable minority district in District 91, Representative Wilder's district. By tak[ing] concentrations of minority population of District 90[,] which is Representative Rhoad[']s district, and get rid of unelectable phantom district that now exists over there. The new district 91 contains all of Allendale County, encompassing the previously split towns of Allendale and Fairfax and put them back together. District 91 also takes the town of Denmark in Bamberg County.

*Id.* at 4.

As to District 103, he stated:

Georgetown/Horry. [T]his change makes District 103, ... Representative Snow's district, a majority black district and a viable district. It was previously what we term the "phantom district." Most of this is achieved by swapping precincts from

District 108, Paula Thomas, with minor changes in District 106, Mr. Keys.

*Id.*

As to Charleston County, he stated:

Charleston, District 109, Representative Whipper, is strengthened by adding middle and upper peninsula of minority precincts in northern Calhoun Street into the district. Additionally, District 109's minority strength is protected by moving some high growth urban areas in Mount Pleasant out of District 109 into District 110 and that's Jimmy Bailey. Finally, minority votes have moved from the northern part of District 109 into District 118, Representative Holt, to increase the numbers there and create a majority/minority district. District 109 will now be 63 percent black and District 118 will be 61 percent black.

*Id.* at 6.

As to District 121, he stated:

Colleton, Beaufort, Hampton, and Jasper Counties. These changes create a 64 percent black district in District 121, Representative Hamilton's district. And most of the strength of minority representative district in District 122, Representative White's district. District 121 takes some of the northern area of the City of Beaufort, all of St. Helena's precinct, Ladys Island 1-B, and Jacksonboro. District 122 takes both the Estill precincts and the town of Laurie, I believe that's correct.

*Id.* at 5.

As to District 121, Representative White was allowed to make a statement as follows:

Mr. Chairman, ladies and gentlemen, this Amendment does a little bit of adjusting within the boundaries of District 120, 121, 122, 123, and 124. It just switches around some population between the four representatives in that area and I move for adoption of this particular agenda. It creates an additional minority district in that area aside District 122, which I am presently representing, which was required from the Justice Department because they had objections in that area for diluting one

of the minority black districts in order to increase the strength in the other district.

*Id.* at 7–8.

In this short presentation, Representative Beatty mentioned race twenty-four times. There is no mention or consideration of any other factor in drawing the district lines.

55. Several amendments were allowed to the Beatty–Clyborne proposal, but members presenting such amendments were instructed that they would not be allowed if they reduced the BVAP of any proposed district. Members were also told by Beatty that the "Department of Justice is calling the shots" and that he "had the votes and you can't change it." The amendments to the plan that were allowed changed lines in such a fashion as to leave the BVAP almost at the exact percentage it had been in the original plan. If moving a line put 200 blacks into another district, then another line had to be changed to bring 200 blacks back into the original district to keep the same BVAP.

56. Shortly after the Black Caucus–Republican Coalition succeeded in getting the Beatty–Clyborne plan out of the Judiciary Committee and onto the floor of the House, Ruoff called Attorney Nancy Sardeson of the DOJ Voting Rights Section and, according to her notes taken contemporaneously with the conversation and which notes were ordered to be produced over stiff objection, Ruoff advised:

Broke Sheheen's back—came out of Judiciary Committee

9 new black districts

Screw white boy Democrats

Blacker than usual

Marlboro/Dillon 64%

Aiken/Edgefield wanted to put Charlie Stone in the black district

1,000 white votes

190 black

Senate—can't sacrifice.

Pls.Ex. 4.

57. The Department of Justice's advocacy position is evidenced in many memoranda, letters and notes of telephone conversations, but most particularly by the apparent epidemic of amnesia that has dimmed the

memory of many DOJ attorneys who were involved with South Carolina's efforts to produce a reapportionment plan that would pass preclearance.[6] Attorney Sardeson identified a DOJ map of South Carolina House districts that was produced under court order. On this map she had written the letter "B" on certain districts and the letter "W" on others. In her testimony, she would not concede that "B" indicated a black district or that "W" indicated a white district. She stated: "I am not going to speculate in terms of why I marked 'B' and 'W.' I am not going to speculate as to why I wrote that on the map." As to another map of South Carolina House districts identified as "SRAC," which is synonymous with the Black Caucus, she had written notes connected by arrows to various districts. Most of these notes are racial in connotation: "Black Caucus Amendment"; "SRAC adds an additional district"; "Will it elect?"; "Increase?"; "Black incumbent." Pls.Ex. 114.

58. The new House reapportionment plan was passed by the General Assembly as Act No. 415. Shortly thereafter, Attorney Mark Posner of the DOJ Voting Rights Section began to call Speaker Sheheen requesting that he expedite the submission of the new plan for preclearance by the DOJ. The attorneys at DOJ had been advised by Ruoff and others that if a new plan was not passed and precleared by June 1, 1994, the three-judge federal court panel would put its own plan in place, and that such a plan had already been developed. Representative Beatty and Attorney Laughlin McDonald of the ACLU had advised the DOJ attorneys that everything should be done to avoid delaying preclearance because the court plan was not as advantageous to minorities as the plan adopted by the House. Additional inquiries were made of Ruoff, and it was determined that delays were caused by a lack of maps of the newly created districts. When Speaker Sheheen advised Mr. Posner that he was preparing the traditional submission package to explain the plan, Posner advised that this was not necessary because he was already familiar with the plan. The new plan

was submitted by Speaker Sheheen on May 23, 1994, and in his letter he called it "an abbreviated submission since the department is anxious to begin its review as early as possible and we will be glad to supplement this submission with any information requested by you or your staff as quickly as possible." Pls.Ex. 5.

59. No additional information was requested from Speaker Sheheen or other official House of Representative sources, but immediately Attorney Bryar of the DOJ began calling John Ruoff about the plan. There are notes of telephone conversations between these two individuals on May 24, 1994 (the day the submission was received), May 26, May 27, and May 31. Memoranda of these telephone conversations made by Bryar contemporaneously with the call are in evidence and all indicate that the information he was seeking related to the racial composition of the various districts. His May 24, 1994 memorandum states in part:

> On Marlboro and Dillon Counties, Mr. Ruoff noted that the black caucus originally wanted to get a higher VAP percentage in that district but that Doug Jennings cannot be beaten unless there is a 57% black turnout in that district. Even at 65% black pop, the alternative district proposed by the black caucus, one cannot get such a turnout. He said that when it came time to amend the bill to get the 65% district in the Senate, the caucus realized that numerous white Democrats would also seek amendments, setting off a feeding frenzy and destroying the bill. So, based on viability and political calculations, the black caucus decided to accept the outcome.

Pls.Ex. 27.

His memorandum of the May 26, 1994 call states in part:

> I called Mr. Ruoff to ask him again about Marlboro–Dillon. He said that the second Black Caucus alternative for that area would have provided for a 63.9% total and a 59.7% voting age district in District

---

6. It was fitting that Department of Justice moved to intervene as a party defendant in the House case, because it had been a most important participant in the process leading to the creation of the challenged districts.

54. He said it would have done this by going into Chesterfield County and picking up black population concentrations in the City of Cheraw. Mr. Ruoff said that even if this plan had passed it would not have led to the election of a black candidate. He said that polarized voting analyses by Jim Lowes shows [sic] that you need at least 57% black voter turnout in order to elect a black candidate in South Carolina rural areas, and Marlboro and Dillon are very rural and plantation-mentality so that at 59.7% of VAP the district could not have produced a 57% black voter turnout. Mr. Ruoff also noted that Jennings is a supporter of the Black Caucus on other issues. Mr. Ruoff said that he had heard that Beatty was off the floor eating when Jennings pulled his trickery to get the plan now before us into place.

Pls.Ex. 28.

The May 27, 1994 memorandum of the conversation between Bryar and Ruoff states, in part:

I asked him about Fairfield and Chester and the failure to take the white areas in Fairfield out of District 41. He said that this was a practical judgment call. He said that there are serious divisions within the black communities in both Fairfield and Chester and that these made it seem impossible to get someone representative of the black community elected from these areas. He said that the Black Caucus often decides to support Timothy Wilkes, the white Democratic incumbent in District 41, because of these divisions. Mr. Ruoff said that he used to be the chair of the Democratic Party in Fairfield County.

I asked him about Edgefield, Aiken and Saluda. He said that the Caucus decided to save a white Democratic incumbent who supports the Black Caucus on other issues in District 39, so they did not totally cure the fragmentation between Saluda and Edgefield. He noted, moreover, that he thinks that the new District 82 is viable. He said that there is no white incumbent in District 82, and that there is a history of black elected officials in Edgefield County, like the county administrator, who is black. On McCormick and Greenwood, he said he thinks the new District 12 is viable. He said that Jennings McAbee, the white Democratic incumbent in that district, is vulnerable, and that there are lots of good black candidates in the area. He said that the lines between Districts 12 and 13 are the result of a deal between McAbee and [Klauber], the white Republican incumbent in District 13.

Pls.Ex. 29. On May 31, 1994, the very day that the DOJ issued its preclearance letter for the new House plan, Bryar was again on the telephone calling John Ruoff and asking about House District 12 and why it did not include more black population concentrations in the Town of Abbeville. He also asked about District 121:

As for District 121, he said that the Black Caucus did not want to weaken District 120 any further in order to strengthen District 121. He said that District 120 is a good influence district. He said that there is a white incumbent in District 121, but noted that it is electable.

Dr. Ruoff noted that he had done some turnout analysis on District 82 and found that it is even more viable than he had thought at first.

He said that the proposed plan does not necessarily fragment black population in the City of Dillon, but that it is so different than the second Caucus alternative because it fails to pick up Cheraw.

Pls.Ex. 30.

60. On May 31, 1994, Assistant Attorney General Deval Patrick wrote a short, two-paragraph letter to Speaker Sheheen advising that the Attorney General did not interpose any objection to the changes contained in the new Act of the General Assembly creating the contested house districts. This expedited consideration of the new plan and the issuance of the letter on the last day of May was motivated by the desire of the Justice Department, the Black Caucus, the Republicans in the House, and the ACLU to prevent the three-judge panel from putting its plan into place.

61. The present House reapportionment plan was passed without any hearings or evidence or findings as to the compactness of

districts, contiguity, or communities of interest within the districts, and it made no analysis as to whether the plan complied with section 2 of the Voting Rights Act.

The evidence is overwhelming that race was the predominant factor in drawing House districts 12, 54, 82, 91, 103, and 121. Race predominated to such an extent as to obliterate any other factor.

62. As to the specific contested House Districts, we make the following findings:

## A. District 12

██ Under the *Burton* court plan, District 12 included all of McCormick County, plus rural portions of Greenwood and Saluda Counties. The district contained a small portion of the City of Greenwood, but respected the Abbeville County line. The total population of the district was 34.54% black, and the voting-age population (VAP) was 32.57% black.

Under H.4333, District 12 was essentially the same as the federal court plan, but it contained more of the City of Greenwood, and the Town of Ninety–Six was removed and placed into District 14. Black population increased to 39.26% of the total population and 36.09% of the VAP.

The Beatty–Clyborne Amendment transformed District 12 rather dramatically. McCormick County was kept intact, but the district went into Abbeville County to split the City of Abbeville, split the City of Ninety–Six, and snaked into the City of Greenwood. All of these municipalities were split essentially along racial lines. District 12 was a new majority-minority district under the Beatty–Clyborne plan, with a 65.01% black total population (BPOP) and a 60.86% black voting-age population (BVAP).

Representative Jennings McAbee, a white Democrat [7] who has represented District 12 for over 20 years, was quite upset by the Beatty–Clyborne Amendment. He met with several representatives in the districts surrounding District 12 and formulated the amendment that ultimately became the version of District 12 in the challenged plan, Act No. 415. The final version of District 12 is bizarrely shaped, with unusual appendages that reach into the Cities of Abbeville and Greenwood, splitting both cities along racial lines. The district also crosses into southwestern Abbeville County and into western Saluda County. *See* Appendix A.

With respect to the Abbeville County portion of District 12 that goes into the City of Abbeville, the population figures provide compelling evidence that those lines were drawn for the sole purpose of capturing black population. The Abbeville 2 voting tabulation district (VTD) [8] is split between District 12 and District 11. Although the Abbeville 2 VTD is heavily black (66.80% BPOP and 61.24% BVAP), the portion of Abbeville 2 that is in District 12 is overwhelmingly black—91.56% BPOP and 89.25% BVAP.

The data with respect to the City of Greenwood provide additional support for Plaintiffs' position. The boundary lines of District 12 drive straight through the City of Greenwood, literally bisecting the town. Within the city, District 12 includes all of two heavily black VTDs: Greenwood No. 2 (83.16% BPOP and 81.34% BVAP) and Greenwood No. 5 (64.84% BPOP and 60.81% BVAP). On the other hand District 13, an adjacent, majority-white district, includes all of one predominantly white VTD: Greenwood No. 3 (15.88% BPOP and 14.29% BVAP). The remaining VTDs in the city are split between District 12 and District 13, with District 12 generally receiving most of the black populations. For example, in the Greenwood No. 1 VTD, the portion in District 12 contains 74.28% BPOP and 70.20% BVAP, while the

---

7. McAbee ran as an Independent in 1994 and defeated his black Democratic opponent in the general election by only 299 votes.

8. Technically, VTDs are not synonymous with precincts or wards. At the time of the 1990 census, approximately 75–80% of the state's precincts were identical to the corresponding VTD. Since the 1990 census, however, many precincts have been changed by legislative enactments. Because the 1990 census information is reported for VTDs, and not necessarily for precincts, this court's analysis must be based on VTDs. Throughout the trial, some witnesses erroneously referred to VTDs as precincts, but the court recognizes the distinction.

**1194**

portion in District 13 contains only 38.46% BPOP and 26.61% BVAP.

Representative McAbee, who was the principal author of the final plan for District 12, testified that there is "no question that race predominated in drawing this district." According to McAbee, Representative Gilda Cobb–Hunter, a member of the Black Caucus, told him that any amendment could not go below 60% BPOP and 57% BVAP. The demographic figures in the final version of District 12 corroborate McAbee's testimony. Under the final plan for District 12, blacks make up 60.84% of the total population and 57.05% of the VAP. In addition, Representative Jim Klauber, a white Republican who represents adjacent District 13, stated that he would go along with McAbee's amendment if no additional minorities were added to District 13. To achieve the requisite racial percentages, McAbee had to give up southern Greenwood County, which contains predominantly white residents who McAbee testified were "like family" to him because he had represented them for 20 years. According to McAbee, he would never have given up those voters were it not for the racial constraints imposed by Representative Beatty's coalition.

District 12 does contain a portion of western Abbeville County in the Calhoun Falls area, which is predominantly white. McAbee testified that he wanted this area in his district because it has attractive natural resources and would be a good site for developing a retirement community. McAbee had developed a similar area in McCormick county and was interested in spurring further economic development within his district. Although the Calhoun Falls area was apparently included in District 12 for a non-racial purpose, that fact does not change the overriding consideration that any proposed amendment had to achieve a definite racial goal.

The boundaries of District 12 do not comply with traditional districting principles. The district is not compact; it does not respect county lines, city lines, or precinct lines; and it does not recognize any distinct communities of interest, other than race,

among its residents. Therefore, this court finds that race was the predominant factor in the drawing of District 12.

### B. District 41

District 41 was a black majority district under the *Burton* court plan, with black individuals accounting for 55.82% of the district's total population and 51.48% of the district's VAP. As drawn by the *Burton* court, the district included all of Fairfield County and took in a relatively small portion of central southern Chester County, including parts of the City of Chester.

Under H.4333, District 41 was identical to the federal court plan.

The Beatty–Clyborne Amendment split Fairfield County, putting the northeastern corner of the county into District 43, an adjacent majority-white district. Under the Amendment, District 41 entered Chester County from the west and captured a larger portion of the City of Chester. The racial percentages in District 41 were increased to 62.50% BPOP and 58.35% BVAP. Although the district was a majority-minority district under the *Burton* court plan, a white Democrat, Tim Wilkes, had been re-elected in the district in the 1992 elections.[9]

The final version of District 41 in Act 415 is the result of an amendment proposed on the floor of the House by Representative Wilkes, which was drawn by Wilkes and Representative Greg Delleney from neighboring District 43. The Wilkes Amendment put Fairfield County back together, especially along the I–77 corridor, where Wilkes testified that he had done a lot of economic development work for the county. The district enters Chester County in the far western portion of the county and splits the City of Chester between three different districts. *See* Appendix B. The final version of District 41 contains 61.31% BPOP and 57.24% BVAP.

District 41 splits several VTDs in Chester County largely along racial lines. For example, in the Eureka Mill VTD, which is split three ways between Districts 29, 41, and 43,

---

**9.** Wilkes was also re-elected in District 41 in 1994, under the challenged plan.

the portion in District 41 contains 87.96% BPOP and 85.60% BVAP, while the portion in District 29 contains only 26.51% BPOP and 25.32% BVAP, and the portion in District 43 contains only 6.08% BPOP and 5.50% BVAP. Similar results can be found in other VTDs in the City of Chester, such as Chester Ward 1, Chester Ward 2, and Chester Ward 3. Overall, the portion of Chester County that is included in District 41 has a 72.69% BPOP and a 68.76% BVAP.

Wilkes testified that race was never an issue in his redrawing of District 41 and that neither Beatty nor anyone else from the Black Caucus ever mentioned any racial population benchmarks for proposed amendments to the House redistricting plan. This testimony is, however, inconsistent with Wilkes's statements during the House debate on his proposed amendment. According to the transcript of the House debate, when Wilkes introduced his proposed amendment, he stated that his plan takes black population out of District 43 and moves it into District 41 "*so that* the voting age population as well as the percentage of black population in the districts is the same as on Amendment Number 2 [the Beatty–Clyborne Amendment]." Pls.Ex. 71, at 19 (emphasis added). It is highly unlikely that Wilkes would have volunteered this racial data if race were not an issue in how his amendment redrew District 41.

Although race was clearly an important factor in drawing District 41, race did not override all other traditional districting principles. District 41 is fairly compact, and it respects the boundary line of Fairfield County by reuniting the county in the northeast. As Wilkes testified, the political desire to maintain the I–77 corridor in his district played a large part in the design of the district.

The district does split the City of Chester; however, the city had been divided before, even under the *Burton* court plan. Because Fairfield County is too small to be its own House district, District 41 has to get population from Chester County. The decision to enter Chester County from the west, rather than from the center, as the *Burton* court did, certainly had racial consequences, but

they were achieved consistently with traditional districting principles. Although the district's lines in Chester County are not as regular as this court might have drawn them, the court finds that race was not the predominant factor in drawing District 41.

### C. District 54

The *Burton* court drew District 54 entirely within Marlboro County. Because the county had slightly more population than the ideal House district, a small area in the southwestern portion of the county was excluded from the district. Under the federal court plan, District 54 had a 49.26% BPOP and a 45.80% BVAP.

Under H.4333, District 54 was identical to the federal court plan.

The Beatty–Clyborne amendment radically changed District 54 into a three-county district, running in a narrow, bizarrely shaped band from the Town of Cheraw to the Town of Dillon. The district split the municipalities of Cheraw, Bennettsville, and Dillon along racial lines to achieve population figures of 63.93% BPOP and 59.64% BVAP.

Representative Doug Jennings, who was elected in District 54 under the *Burton* court plan, testified that he was quite disturbed by the Beatty–Clyborne Amendment's reconfiguration of his district. He also testified that all of the residents in his district, including many leaders of the black community, were concerned about the proposed changes to District 54. According to Jennings, he approached Representative Beatty to express his concerns about District 54, and Beatty told him that the Black Caucus had the votes and that the plan was somewhat inflexible because the Department of Justice was "calling the shots." In addition, Jennings testified that John Ruoff told him, "Don't stand in front of this train." Jennings wanted to prepare an amendment to the Beatty–Clyborne plan for District 54. He testified that Beatty told him that any proposed amendment had to maintain at least 58% black total population or it would automatically fail.

The challenged version of District 54 in Act 415 is the result of an amendment that Jennings drafted. He put much of Marlboro

County back together, reuniting Bennetts-ville, but containing a slight incursion into Chesterfield County. The most prominent feature of District 54 is a narrow appendage that extends deep into Dillon County along Highway 9, eventually splitting the Town of Dillon. The district is quite non-compact and contains a point of contiguity at a four-way intersection in downtown Dillon. *See* Appendix C. As passed by the House in May 1994, District 54 contains 58.02% BPOP and 53.89% BVAP.

Jennings, who actually sat at the computer terminal with several technicians and drew his proposed amendment, stated that in drawing his amendment he relied solely upon block-by-block racial information from the census database. He testified that, "as certain as I am sitting here," race was clearly the predominant factor in drawing District 54. He also stated that the only purpose of going into Dillon was to increase the black population percentage of the district.

The VTD data from District 54 supports Plaintiffs' position that race predominated in the drawing of the district. The South Dillon VTD, which is wholly included in District 54 south of the point of contiguity, has a 64.89% BPOP and a 59.22% BVAP. District 54 also splits several VTDs largely along racial lines. For example, the West Dillon VTD is split such that the portion contained in District 54 has 83.31% BPOP and 78.93% BVAP, while the portion contained in District 55 has only 39.95% BPOP and 35.43% BVAP. Also, the Cash VTD in Chesterfield County is split such that the District 54 portion has 77.75% BPOP and 77.81% BVAP, while the District 53 portion has only 38.67% BPOP and 37.32% BVAP.

By any definition the shape of District 54 is bizarre. During the floor debate in the House on this amendment, Representative Jennings himself stated,

I will acknowledge at this podium prompt for the record that I think this Amendment has some *Shaw v. Reno* ramifications and potential problems, but I would submit

respectfully that it does not have near the *Shaw v. Reno* problems that Amendment Number 2 [the Beatty–Clyborne Amendment] has that has already been adopted with respect to our area of the state.

Pls.Ex. 71, at 11. The evidence in the record clearly supports a finding that race was the predominant consideration in the drawing of District 54.

### D. District 76

District 76 is one of eleven house districts based primarily in Richland County. Under the *Burton* court plan, Richland County contained four majority-minority House districts: Districts 70, 73, 74, and 77. District 76 was located on the east side of Columbia, running roughly in a north-south direction and containing several neighborhoods of Columbia. It was a majority-white district, with only 10.58% BPOP and 10.33% BVAP.

Under H.4333, the boundaries of District 76 were almost identical to the federal court plan, but black population increased slightly to 13.92% BPOP and 13.06% BVAP.

The Beatty–Clyborne Amendment redrew the Richland County districts, especially in the Columbia area. The Amendment reconfigured District 76 to be the fifth majority-minority district in Richland County. The Beatty–Clyborne version of District 76 became part of Act 415, because no other successful amendment relating to this district was introduced on the floor of the House.

The challenged version of District 76 has been shifted to the north and northeast part of Columbia and runs in more of an east-west direction. *See* Appendix D. It takes some black population out of other historically black majority districts and includes some institutional population from Columbia College.[10] District 76 was an open seat in the 1994 election, because two white incumbents, Representatives Candy Waites and Jim Harrison, were pitted against each other in District 75.[11]

---

**10.** Institutional and military populations are very attractive to politicians because they are counted in the total population of a district, but generally do not vote in that district.

**11.** Representative Waites did not offer for re-election in 1994.

Although race was clearly a significant factor in the design of District 76, the court cannot conclude that race was the predominant factor in the drawing of the district, such that traditional districting principles were subordinated to race. District 76 is relatively compact, at least when compared to the other House districts in the Columbia area. While the court recognizes that geographical compactness is a function of population density, District 76 complies with this court's general understanding of compactness. Certainly, the residents of the district are somewhat diverse: the east end of the district and the west end are in different school districts, and the district crosses the city limits of Columbia. However, the residents of District 76 share many general urban interests in much the same way as do residents of the other House districts in the Columbia area. Furthermore, the shape of District 76 is not egregious. It follows the VTD lines in the area almost perfectly, splitting only one VTD in the eastern-most portion of the district. The *Burton* court plan split nine VTDs in its version of District 76.

Accordingly, the court finds that Plaintiffs have not satisfied their burden of proving that race predominated in the drawing of District 76.

### E. District 82

District 82 under the *Burton* court plan included all of Edgefield County, plus a part of rural Aiken County. Because the population of Edgefield County is too small to constitute a House district on its own, the court found it necessary to get additional population from rural Aiken County. Under the federal court plan, District 82 does not go into the City of Aiken, which has traditionally formed the base of its own House district. As configured by the *Burton* court, District 82 had a 40.23% BPOP and a 37.34% BVAP.

Under H.4333, District 82 was identical to the federal court plan.

The Beatty–Clyborne Amendment made a significant transformation to District 82. It split Edgefield County, taking the county's western portion, which is more than 90% white, and putting it into District 83, a majority-white district. Also, District 82 snaked down into the City of Aiken to pick up black population and included three predominantly black VTDs from Saluda County.[12] These changes transformed District 82 into a black majority district, with 63.03% BPOP and 59.35% BVAP. In addition, the Beatty–Clyborne Amendment created an open House seat in District 82 by pitting two white incumbent House members—Representatives Charles Stone and Tommy Huff—against each other in District 83.[13]

The final version of District 82 that passed in Act 415 is the result of an amendment proposed by Representative Molly Spearman of District 39, which is located primarily in Saluda County. Spearman's amendment put the Ridge Spring VTD, which is located in southern Saluda County, back into District 39 and added two very odd appendages in Aiken County to District 82. Her amendment also narrowed District 82's entrance into the City of Aiken. *See* Appendix E. The final version of District 82 has a 59.09% BPOP and a 54.96% BVAP.

Challenged District 82 clearly does not comport with traditional districting principles. It is not compact and is bizarrely shaped, with three separate, abnormal appendages into Aiken County. It does not respect county lines or city lines, splitting the Counties of Edgefield, Aiken, and Saluda, as well as the City of Aiken. And the district was not designed to recognize any identifiable communities of interest other than race.

The VTD data for District 82 provides compelling evidence that race predominated in the drawing of this district. The two VTDs in Saluda County that are part of District 82 contain greater than 60% BPOP and greater than 55% BVAP. The portion of

---

**12.** All of the VTDs in the Saluda County portion of District 82 under the Beatty–Clyborne plan have greater than 60% BPOP and greater than 55% BVAP. Pls.Ex. 73, at 45.

**13.** Representative Stone proposed an amendment to put his home precinct in western Edgefield County back into District 82 so that he would no longer be pitted against Representative Huff in District 83. However, that amendment failed to pass.

Edgefield County that is cut out of District 82 and placed into District 83 contains only 8% BPOP and 5.78% BVAP. The precincts from the City of Aiken that are included in District 82 are, for the most part, heavily black. In addition, the two rather unusual appendages into Aiken County at the eastern portion of District 82 split VTDs along racial lines. In the Ward VTD, which is split by two separate parts of District 82, the portion of the VTD included in District 82 has a 76.54% BPOP and a 74.25% BVAP, while the portion of the VTD included in District 86 has only a 22.21% BPOP and a 20.32% BVAP.

For these reasons, the court finds that race clearly predominated in the drawing of District 82 in the challenged plan.

#### F. District 91

Under the *Burton* court plan, District 91 contained all of Barnwell County and most of Allendale County. According to Representative Bob Sheheen, Barnwell County had never been split before by a House district. As drawn by the federal court in 1992, District 91 contained a total population that was 47.98% black and a VAP that was 44.05% black.

Under H.4333, District 91 was identical to the federal court plan.

The Beatty–Clyborne Amendment placed into its configuration of District 91 all of Allendale County, which has the highest percentage of black population of any county in South Carolina. The district goes into Barnwell County, but hooks around the predominantly white portion of the county to put those people into neighboring District 90.[14] District 91 also goes into Bamberg County to capture the heavily black area of Denmark. *See* Appendix F. The Beatty–Clyborne Amendment became the final version of District 91 in Act 415, because no other successful amendment to the district was made on the floor of the House. The challenged version of District 91 has a 65.52% BPOP and a 61.59% BVAP.

The boundaries of District 91 cannot be explained by traditional districting principles other than race. The shape of the district is bizarre because of the hook around the white population in central Barnwell County. The district's appearance is made more regular only by the presence of the Savannah River Atomic Energy Site, which occupies a large portion of western Barnwell County but is mostly uninhabited. Although the district includes the entirety of Allendale County, it does not respect county lines, because it divides Barnwell and Bamberg Counties.

Furthermore, District 91 cannot be explained as an attempt to link distinct communities of interest other than race. Barnwell County itself has a unique community of interest because of the presence of industries such as Chem Nuclear and the Savannah River Site. Yet, under the Beatty–Clyborne Amendment, Barnwell County is split along racial lines.

Although District 91 splits no VTDs, the VTD data suggests that race motivated the creation of the district. For example, the two VTDs from Bamberg County that are included in District 91 (*i.e.*, the East Denmark and West Denmark VTDs) have an average BPOP of 79.19% and an average BVAP of 76.44%.

Therefore, the court finds that race was also the predominant factor used in drawing District 91.

#### G. District 103

District 103 was a majority-minority district under the *Burton* court plan, with blacks comprising 54.74% of the district's total population and 50.01% of the district's VAP. Representative Sheheen testified that in 1992, District 103 "teetered on electing a black or a white House member." The district included parts of three counties (Williamsburg, Georgetown, and Horry), but was centered in Georgetown County. District 103 did not go into the City of Georgetown under the 1992 federal court plan.

Under H.4333, District 103 generally followed the theme of the federal court plan,

---

14. The portion of Barnwell County that is excluded from District 91 and placed into District

90 contains only 31.79% BPOP and 27.82% BVAP. Pls.Ex. 74, at 90.

but made some small changes in Williamsburg County and southwestern Georgetown County. The black population percentages of District 103 declined slightly under H.4333's version of the district, to 51.26% BPOP and 46.61% BVAP. Thus, H.4333 changed District 103 from a BVAP-majority district to a BVAP-minority district.

The Beatty–Clyborne Amendment significantly strengthened black population in District 103, to 63.76% BPOP and 58.92% BVAP. This result was achieved primarily by changing the District's portion of Horry County and by going into the northwestern portion of the City of Georgetown. *See* Appendix G. The Beatty–Clyborne Amendment for District 103 became the final version of the district in Act 415, because no other successful amendment to the district was introduced on the floor of the House.

The challenged version of District 103 shows little regard for traditional districting principles other than race. Although the district is moderately compact, it contains unusual appendages into Horry County and into the City of Georgetown. The district does not respect political boundary lines, splitting Georgetown County and Horry County, and splitting Williamsburg County in two separate places. The only part of Horry County that is kept in District 103 is the Port Harrelson VTD, which has a BPOP of 91.97% and a BVAP of 90.01%.

As noted above, the district also divides the City of Georgetown, generally along racial lines. The VTDs from the City of Georgetown that are included in District 103 are overwhelmingly black. For example, the Georgetown 2 VTD has a 98.07% BPOP and a 98.03% BVAP. The Georgetown 3 VTD has a 77.87% BPOP and a 72.28% BVAP. And the Georgetown 7 VTD has a 99.64% BPOP and a 99.40% BVAP. Pls.Ex. 74, at 103.

District 103 cannot be explained as an effort to link distinct communities of interest. The residents of District 103 from the urban portion of the City of Georgetown have little in common with the other residents of the district from rural Georgetown and Williamsburg Counties. Certainly, there was no evidence in the record that identified such a commonality, other than race, which influenced the placement of the boundary lines for this district.

In its objection letter of May 2, 1994, the Department of Justice suggested that additional black population could be included in District 103 by going into the black concentrations in the City of Georgetown. As with other districts discussed in the objection letter, the DOJ did not mention any districting criteria other than race with respect to District 103.

For these reasons, the court finds that race was the predominant factor in the drawing of District 103.

### H.  District 118

Under the *Burton* court plan, District 118 was basically a North Charleston district. It had a total population that was 42.60% black and a VAP that was 36.38% black.

Under H.4333, District 118 was identical to the federal court plan.

The Beatty–Clyborne Amendment transformed District 118 into a narrow band that generally runs in north-south direction from North Charleston, along the Cooper River, and down into the peninsula of Charleston. *See* Appendix H. The final version of District 118 in Act 415 did not change from the Beatty–Clyborne Amendment. The challenged version of District 118 is a new majority-minority district, with a 61.36% BPOP and a 53.22% BVAP. District 118 contains much of the Charleston Naval Shipyard, including approximately 5,700 people counted on a Navy ship in the Naval Shipyard No. 3 VTD.

District 118 complies rather well with traditional districting principles. Although the district is fairly long and narrow, it is one of the most regular and most compact House districts in the Charleston area.

Race was undeniably a significant factor in determining where some of the boundary lines of District 118 were placed. Some VTDs in North Charleston appear to have been split along racial lines. However, the court finds that race did not predominate at

the expense of all other traditional districting principles in the drawing of District 118.

### I. District 121

District 121 in the *Burton* court plan was based primarily in Colleton County, including a portion of central Beaufort County. Under the federal court plan, the district did not invade the City of Beaufort. District 121 was a majority-white district under the *Burton* plan, with 38.17% BPOP and 34.75% BVAP.

Under H.4333, District 121 was essentially the same as under the federal court plan. The only change was the result of a request from Representative Juanita White, an African-American House member from District 122, who wanted to eliminate from her district an area where a proposed retirement community was to be built. As a result of this change, District 121 under H.4333 had a 39.10% BPOP and a 36.49% BVAP.

The Beatty–Clyborne Amendment changed District 121 rather dramatically. Representative James "Preacher" Harrelson, who represented District 121 as drawn by the *Burton* court, stated that the proposed amendment changed his district "about like an atomic bomb." The district was moved further south, starting at Walterboro, and going much deeper into Beaufort County, including into the City of Beaufort. Those changes produced a new black majority district with 64.71% BPOP and 61.55% BVAP.

Representative Billy Keyserling, who represented adjacent District 124, testified that the Beatty–Clyborne Amendment had a severe impact on his district as well. Under the *Burton* court plan, District 124 contained both the City of Beaufort and St. Helena Island,[15] two of South Carolina's most significant historical districts. Keyserling explained that the historical significance of these two areas created a unique and important community of interest in his district. Under the Beatty–Clyborne Amendment, however, St. Helena Island, which is predominantly black, was moved into District 121.

The final version of District 121 in Act 415 was the product of a floor amendment to the Beatty–Clyborne Amendment. Under the final plan, District 121 remains a majority-minority district, with a BPOP of 61.18% and a BVAP of 57.23%.

District 121 ignores virtually all traditional districting principles except for race. The challenged district is anything but compact, as it spans the entire length of Colleton County, starting north of Smoaks and winding all the way south to Edisto Beach. It also takes in a large portion of Beaufort County and splits the City of Beaufort in a very unusual manner. *See* Appendix I.

The shape of District 121 is also bizarre, explainable only by the racial consequences of where the lines are drawn. The portions of the City of Beaufort that are included in District 121 are predominantly black. For example, in the Beaufort 1B VTD, which is split by the district, the portion in District 121 contains 82.85% BPOP and 79.50% BVAP, while the portion in District 124 contains only 14.29% BPOP and 13.79% BVAP. Similarly, in the Beaufort 3 VTD, which is also split by District 121, the portion in District 121 contains 76.51% BPOP and 64.71% BVAP, while the portion in District 124 contains only 11.10% BPOP and 8.78% BVAP.

There is no identifiable community of interest between the residents of District 121. It is difficult to imagine what persons in Walterboro have in common with residents of the sea islands in the southern portion of the district.

Furthermore, much of the southern portion of District 121 is contiguous only by water. Although contiguity by water is unavoidable in some parts of South Carolina, a candidate wishing to campaign in District 121, or a representative wishing to visit his or her constituents in the district, would have to travel well outside of the district to reach all of the voters in the district. In addition, communication between some parts of the district requires a long-distance phone call.

All of these factors compel the court to find that race was the predominant factor in the drawing of District 121.

---

15. St. Helena Island contains the Penn Center School for Freed Slaves.

63. The history of the efforts of the House to reapportion itself in 1994 is a necessary precursor to understanding the efforts of the Senate in 1995 to adopt a plan of reapportionment, and why this plan received such quick approval by Department of Justice on section 5 review. As Senator Glen McConnell, Republican Member of the Senate Reapportionment Subcommittee testified, "The Senate decided to take a noncombative posture in dealing with the Department of Justice. We had found it better and cheaper to cooperate and to get clearance ... we were familiar with what happened to the House and we wanted preclearance." The members of the Subcommittee were appointed by then-President *Pro Tempore* of the Senate Marshall Williams, and it contained a good cross-section of able and experienced senators, but it had no members who had a real grasp of the computers and maps used in drawing districts. Senator Williams had charged the Subcommittee that its duties were "to find out what the law is and to do the right thing." The Subcommittee scheduled meetings in various places in the state to receive input from citizens, but few citizens attended and little input was forthcoming. A video cassette was made explaining reapportionment and was sent to schools and special interest groups soliciting comments, but again there was very little response. The Subcommittee adopted criteria for reapportionment as set forth in Finding No. 20.

64. The Subcommittee turned to the Clerk of the Senate, Frank Caggiano, and Attorney Mike Couick, Counsel to the Senate Judiciary Committee, to prepare a plan. Meetings of the Subcommittee were held in the early months of 1995, and on March 6, 1995, the following resolution was adopted:

I move that it be the sense of the subcommittee that the staff be directed to draw a plan consistent with the criteria previously adopted by this subcommittee and consistent with the decision of the U.S. Supreme Court in *Johnson v. De Grandy*, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) and also taking into account the concerns expressed by the United States Department of Justice in its § 5 review of the redistricting plans passed by the House. Further, that in drawing the plan, staff

should take into account variations in election history and differences in registration, turnout, and voting patterns in different parts of the state.

Stip.Ex. M, at 2. The staff (Caggiano and Couick) were directed to prepare a plan and receive public submissions, and a timetable was set for receiving such submissions.

65. It is obvious that Couick and Caggiano interpreted *De Grandy* as requiring proportionality and drew additional BVAP districts to achieve this goal. As Caggiano testified in his deposition: "The way I understand *De Grandy* is that if you achieve or come close to rough proportionality that's it. You've got a real good chance of making it past review." When asked if he understood the Voting Rights Act to disavow proportionality, he answered: "I did not know that." In his testimony, Couick also acknowledged that proportionality was the purpose behind the creation of the two new majority districts: "I ... reached the conclusion ... the better course was for the Senate to seek a safe harbor such as that was discussed by the U.S. Supreme Court in *De Grandy* that would reach a different result than was reached by the court in 1992."

66. In 1992, Couick had testified in the *Burton* litigation that the Senate had sought to go beyond *Gingles* and to draw as many electable black districts as possible in the context of the criteria the subcommittee had developed. He said that if the standard was to draw as many majority-black districts as possible, he thought the Senate had achieved this with ten districts. Although he testified to the court in *Burton* that the plan before that court offered the most electable majority-black districts that could be created, he and Caggiano found a way to create two additional black majority districts in the present plan. These two new majority-minority districts are Districts 29 and 37. Furthermore, Couick testified that one additional black-majority Senate district could be drawn from naturally occurring concentrations of black population; however, at trial, he could not specifically identify such an area.

Couick testified that neither the staff nor the Subcommittee ever performed a section 2

analysis of the Senate plan because they did not think it was necessary. He also testified that he does not remember studying the May 2, 1994 DOJ letter to Speaker Sheheen, although he was directed to do so by the resolution of the Subcommittee.

67. When Senator Gregg Smith saw the configuration of his district, District 34, on the proposed plan, he realized that it stretched from Surfside Beach in a very thin strip 90 miles down the coast to Mt. Pleasant. He also realized that most of the black population had been moved into an adjoining district. He questioned Couick and was told that he just lived in the wrong place and that one, two, or three additional black majority districts were necessary to obtain preclearance. He also talked with Caggiano, who helped him work on the Senate computer, but was told, "Our main goal is DOJ preclearance."

68. Some amendments were allowed to the staff plan, particularly in Senate District 29, where Senator Ed Saleeby redrew a number of lines to exclude three potential opponents, who were incumbent House members, and also to move Senator Hugh Leatherman out of the district.

69. Senator McConnell testified that the Governor's office wanted to maximize the number of majority-minority Senate districts. The court asked McConnell why none of the witnesses, particularly attorneys, would acknowledge that *Miller* and *Shaw II* had changed the law as to drawing electoral district lines, and that, although the lines may have been drawn in good faith in 1994 according to what they thought the law required, no one would now state that the law had changed in a way that could not have been anticipated. Senator McConnell responded, "Rules may have changed in the courts but not in the subcommittee." This is in keeping with Couick's testimony concerning the criteria adopted by the subcommittee. Such criteria was a guideline that could always be overridden by the necessity of getting enough votes to pass a plan.

70. The challenged Senate districts were all created with race as the predominate factor. Districts 29 and 37 were drawn for the sole purpose of establishing safe majori-ty-minority districts with sufficient BVAP, at least 58%, to meet the figure Ruoff had set as necessary to elect a black candidate 85% of the time. District 34 is overwhelmingly white, but race was the predominate factor in its creation, because most of its black population was intentionally removed to increase the black percentage in District 37. Also, it is manifest that the Senate was seeking to achieve racial proportionality in creating Districts 29 and 37.

71. Although Senate witnesses denied at trial that they were seeking proportionality, we do not find this testimony credible. In its trial brief, the Senate stated that two reasons, other than the *Gingles* considerations that informed the creation of Districts 29 and 37 were:

1. The lack of rough proportionality between the black population of South Carolina (29.8%) and the number of black-majority senate districts under the court plan (eleven of forty-six, or 23.9%); and

2. The fact that a black senator had never been elected from the areas now included in S.D. 29 and 37.

The effort to achieve proportionality is also obvious from the resolution guiding the reapportionment process in the Senate, as evidenced by Finding of Fact 64. Attorney Couick and the Subcommittee misread *De Grandy* as a call for proportionality.

72. Evidence that the Senate surrendered to Department of Justice pressure is further found in the preclearance process. Only Attorney Nancy Sardeson reviewed the Senate's May 1995 submission. She said her supervisor, Attorney Posner, gave it a very brief review. Because the Senate had complied with the demands of the DOJ's Voting Rights Section in creating the two new BVAP senatorial election districts, it was not unexpected that approval would be prompt, and it was done in just a few days.

73. In South Carolina, voting has been, and still is, polarized by race. This voting pattern is general throughout the state and is present in all of the challenged House and Senate districts in this litigation. There is only one exception according to Defendants' expert, Dr. Ruoff, who has studied the voting

history of South Carolina for a number of years. He testified, "Whites almost always vote for whites and blacks almost always vote for blacks unless the candidate is a black Republican and then never."

74. In the challenged House and Senate districts, there is a socio-economic gap between the average white citizen and the average black citizen. There is a larger percentage of blacks than whites below the poverty level; the household income of blacks is generally less than that of whites; unemployment is greater among blacks; and the level of formal education among blacks is less. There are more whites than blacks residing in married-couple households, and more blacks live in single-female households. More blacks than whites are without private means of transportation, and more whites than blacks own their own homes. Infant mortality is greater among blacks.

75. As to the contested Senate Districts, we make the following findings:

The challenged Senate redistricting plan, S.9, contains twelve majority-minority districts based on total population. S.9 divides 167 VTDs, 24 between white-majority districts, 9 between majority-minority districts and 134 between white-majority and majority-minority districts, with many of the 134 split along racial lines in these districts.

In a memo to the attorneys for the ACLU, Ruoff described S.9 as it was ratified:

District 37, the open new majority-black district had been changed to accommodate a black House member who wanted out of it. The change (moving Williamsburg out and Georgetown in) is pretty ugly, but works. It makes Distr. 32 (McGill) harder, but Dist. 37 easier to elect a black Senator. The numbers aren't much changed.

\* \* \* \* \* \*

Two new districts are created. Dist. 29 in Chesterfield, Darlington, Florence and Marlboro has an incumbent white senator (Ed Saleeby). He is not in good health and is probably good for one more run at most. Three white Democratic House members were drawn out of the district over their protests. Black House member, Jesse Hines, is in the district. The district

has an adjusted black VAP of 56.19 percent. It may be a real district even with Saleeby in it.

Pls.Ex. S–55. Ruoff notes that S.9 creates 12 opportunity districts and zero phantom districts. Ruoff writes that he is basically satisfied with S.9 "except that some of the districts are truly ugly," especially the "white districts." He also notes that "[t]here are lots of split precincts." *Id.*

Under S.9, Districts 29 and 37 are majority-minority districts. District 29 has 60.396% BPOP and 56.298% BVAP. District 37 has 58.434% BPOP and 55.530% BVAP. District 34 was reduced from 36.77% BPOP and 32.90% BVAP to 11.240% BPOP and 9.469% BVAP.

### A. District 29

District 29 is comprised of portions of five counties: Chesterfield, Darlington, Florence, Lee, and Marlboro. District 29 contains no intact counties, even though four of the five counties in District 29 are small enough to be completely included in a district.

District 29 is located in the north central portion of the state. Beginning in Marlboro County, at the North Carolina/South Carolina border, the district moves southwesterly, picking up a slice of Chesterfield County, most of the land area of Darlington County, and a substantial portion of Lee County. The district also sends a tentacle eastward into Florence County. *See* Appendix J. The distance between the municipalities of Florence, Bishopville, and Bennettsville, which are all included in the district, is approximately 72 miles. District 29 is intersected by District 31, which cuts through the heart of Darlington County, east to west, leaving only a one-and-a-half-mile corridor to connect the northern half of District 29 with the southern half. Most of District 29 is outside metropolitan areas, but the district has a finger that goes into the metropolitan section of Florence.

District 29 takes in 3% of Chesterfield County, a county with 33% BPOP and 30% BVAP. The portion of Chesterfield County in District 29 has 55% BPOP and 54% BVAP. The district takes in 60% of Darlington

County, a county with 40% BPOP and 36% BVAP. The portion of Darlington County included in the district has 57% BPOP and 54% BVAP. District 29 includes 8% of Florence County, a county with 39% BPOP and 35% BVAP. The portion of Florence County contained in the district has 60% BPOP and 57% BVAP. District 29 takes in 55% of Lee County, a county with 62.5% BPOP and 57% BVAP. The part of Lee County in District 29 has 68% BPOP population and 63% BVAP. The district includes 62% of Marlboro County, a county with 49% BPOP and 45% BVAP. The part of Marlboro County in District 29 has 62% BPOP and 58% BVAP.

The municipality of Bennettsville is divided along racial lines. All but 418 of the 5,514 blacks who live in Bennettsville are included in District 29. Two-thirds of the 4,036 whites who live in Bennettsville are in District 28. Bennettsville has 58% BVAP overall. The section of Bennettsville in District 28 has 13% BVAP, and the section in District 29 has 80% BVAP.

Both of Darlington County's major municipalities, Hartsville and Darlington, are carved up between Districts 29 and 31. District 29 takes in 91% of Hartsville's 3,592 black residents and more than 82% of Darlington's 3,994 blacks, while District 31 claims 61% and 92%, respectively, of the white residents of Hartsville and Darlington. Hartsville as a whole has 42% BVAP. The section of Hartsville in District 29 has 63% BVAP, while the section in District 31 has 10% BVAP. The City of Darlington has 52% BVAP. The section of Darlington in district 29 has 92% BVAP, while the section in District 31 has 17% BVAP.

District 29 splits 29 VTDs. Darlington County has 15 split VTDs. Several of these VTDs are split along racial lines. District 29 takes 779 people in the Clyde Black Creek VTD, with 21.42% BVAP. District 31 takes 732 people from Clyde Black Creek with a BVAP of only 3.17%. In the Darlington 1 VTD, District 29 takes 243 people with 48.30% BVAP, and District 31 takes 248 people with 9.69% BVAP. In Darlington 2, District 29 takes in 1,162 people with 75.71% BVAP, whereas District 31 includes 1,483 people with 16.38% BVAP. In Darlington 3,

District 29 includes 879 people with 61.98% BVAP, and District 31 has 3,400 people with 9.09% BVAP. In Darlington 4, District 29 takes in 1,866 people with 86.08% BVAP and District 31 takes in 483 people with 24.50% BVAP. In Hartsville 5, District 29 includes 2,645 people with 29.82% BVAP, and District 31 contains 923 people with 1.13% BVAP. In Hartsville 8B, District 29 contains 1,795 people with 41.55% BVAP, and District 31 contains 720 people with 2.38% BVAP. In Florence County, District 29 splits 5 VTDs. District 29 takes in 564 people in the Glenwood VTD with 82.80% BVAP. District 36 takes in 1,213 with a BVAP of 29.88%. In Tans Bay, District 29 includes 469 people with 58.65% BVAP, and District 31 contains 1,639 people with 9.62% BVAP. In Marlboro County, District 29 takes in 3,607 people in East Bennettsville with 78.26% BVAP, and District 28 takes in 3,824 people with 15.83% BVAP. In South Bennettsville, District 29 includes 937 people with 69.40% BVAP, and District 28 includes 591 people with 8.33% BVAP.

### B. District 37

District 37 is comprised of portions of five counties: Berkeley, Charleston, Colleton, Dorchester, and Georgetown. Senate District 37 in the S.9 plan contains no whole counties.

District 37 takes in substantial portions of Berkeley and Dorchester Counties. It follows the northern and western perimeter of the Charleston metropolitan area and also protrudes into Georgetown and Colleton Counties, neither of which are in the metropolitan region. The district meanders around the axis of U.S. Highway 17 (Alt.), stretching east to west from Georgetown to Monck's Corner (Berkeley County) to Summerville (Dorchester County) to Walterboro (Colleton County). See Appendix K. A traveler following this route, itself 98 miles long, would pass into and out of District 37 several times and would miss a great deal of this district.

District 37 includes 28% of Berkeley County, a county with 24% BPOP and 22.5% BVAP. The section of Berkeley County included in District 37 has 55% BPOP and 52%

BVAP. District 37 includes 2% of Charleston County, a county with 35% BPOP and 31% BVAP. The section of Charleston County included in District 37 has 75% BPOP and 73% BVAP. District 37 contains 41% of Colleton County, a county with 45% BPOP and 42% BVAP. The portion of Colleton County in District 37 has 52% BPOP and 48% BVAP. District 37 contains 14.5% of Dorchester County, a county with 23% BPOP and 22% BVAP. The section of Dorchester County included in District 37 has 57% BPOP and 55% BVAP. District 37 contains 15% of Georgetown County, a county with 43% BPOP and 38% BVAP. The section of Georgetown included in District 37 has a BPOP of 75% and a BVAP of 72%.

District 37 carves up the municipalities of Georgetown, Monck's Corner, Summerville, and Walterboro. The section of District 37 in Summerville (a predominantly white city) is about four blocks wide and extracts 2,239 people, three-fourths of whom are black. Summerville has 17% BVAP overall, but the section of Summerville in District 37 has 76% BVAP. District 37 encircles Monck's Corner, most of which is in District 44, but takes in 2,354 people, 54% BVAP. Monck's Corner as a whole has 33% BVAP. The municipality of Walterboro has 45% BVAP, and the section of Walterboro in District 37 has 55% BVAP.

Senate District 37 divides 24 VTDs. Several of these VTDs are split along racial lines. In Berkeley County, District 37 splits five VTDs. In the Berkeley VTD, District 37 includes 1,439 people with 42.68% BVAP, whereas District 44 includes 1,022 people with 3.38% BVAP. In Cordesville, District 37 includes 898 people with 61.60% BVAP, and District 44 contains 509 people with 17.76% BVAP. In Monck's Corner, District 37 contains 4,899 with 52.04% BVAP, and District 44 contains 4,997 with 11.08% BVAP. In Charleston County, District 37 splits four VTDs. In Christ Church 7, District 37 includes 584 people with 73.43% BVAP, and District 34 includes 1,053 with 39.23% BVAP. In Georgetown County, Georgetown 1 is split between District 34, taking 614 people with 9.70% BVAP, and District 37, taking 814 people with 65.56% BVAP.

### C. District 34

District 34 snakes along the northern half of South Carolina's Atlantic shoreline, taking in portions of Horry, Georgetown, and Charleston Counties. The district extends from the southeastern corner of Horry County southward through Georgetown County and on to the edge of the Cooper River in Charleston County. *See* Appendix L. From north to south, the district is about 90 miles long, running from Surfside Beach in Horry County to Mt. Pleasant in Charleston County.

At least two-thirds of the district's population is located at the extreme ends of the district, in Mt. Pleasant and Horry County. Much of the district between these two places is comprised of uninhabited, barrier islands, many of these unconnected by any roads or bridges. District 34 does go inland, sending a pincer that encircles the municipality of Georgetown and takes in two-fifths of the town's population. At one point in Georgetown, district 34 narrows to a width of less than a block.

Charleston County has a 35% BPOP and 31% BVAP. The section of Charleston County in District 34 has a BPOP of 11.6% and 10% BVAP. Georgetown County has a BPOP of 43% and 38% BVAP. The portion of Georgetown County in District 34 has 17% BPOP and 14% BVAP. Horry County has 17.5% BPOP and 14.6% BVAP. The portion of Horry County in District 34 has 6% BPOP and 4.5% BVAP.

Georgetown, a community of only 9,848 people with 54% BVAP, is split among three districts, with District 32 taking 1,748 persons (78% BVAP) and District 37 claiming 3,767 people (85% BVAP). District 34 claims 4,333 Georgetown residents, 84% white. The municipality of McClellanville has 34% BVAP. The section of McClellanville in District 34 has only 6% BVAP, while the section in District 37 has 61% BVAP. The City of Mt. Pleasant has 9% BVAP, and the section of Mt. Pleasant in District 34 has 9% BVAP. The section of Mt. Pleasant in District 37 has 100% BVAP. District 34 divides 10 VTDs, and a description of the racial splits can be

found under the analysis of split VTDs in District 37.

## CONCLUSIONS OF LAW

■ These actions are brought under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and allege that the nine contested House districts and the three contested Senate districts unconstitutionally separate voters according to race. The prohibition against segregating or separating citizens into voting districts according to race is now well established. *See Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"); *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); and *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("*Shaw I*"). Gerrymandering has been a part of our political system since the word was coined more than 175 years ago. The drawing of district lines for political purposes has often been criticized, but it is not illegal. However, the Supreme Court has determined that gerrymandering which divides voters according to race violates the Equal Protection Clause. In *Miller,* the Court explained, "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates in the polls.' " —— U.S. at ——, 115 S.Ct. at 2486 (quoting *Shaw I,* 509 U.S. at 647, 113 S.Ct. at 2826–27). Furthermore, in *Shaw I,* the Court stated:

Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

*Shaw I,* 509 U.S. at 657, 113 S.Ct. at 2832.

The holding in *Shaw I,* which was affirmed in *Miller, Bush,* and *Shaw II,* is the result of natural progression beginning with *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which held that citizens may not be segregated on the basis of race in public schools. Other cases followed, holding that citizens may not be segregated on the basis of race in public parks, *New Orleans Park Improvement Ass'n v. Detiege,* 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46 (1958); or buses, *Gayle v. Browder,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); or golf courses, *Holmes v. Atlanta,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955); or beaches, *Mayor & City Council of Baltimore v. Dawson,* 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955).

■ The prohibition against dividing or segregating citizens by race applies equally to districting cases, and the state's assignment of voters according to race is subject to the court's "strictest scrutiny." *Miller,* —— U.S. at ——, 115 S.Ct. at 2488.

The *Miller* Court articulated the burden of proof that plaintiffs must satisfy in these cases:

The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can "defeat a claim that a district has gerrymandered on racial lines."

*Id.* (quoting *Shaw I,* 509 U.S. at 647, 113 S.Ct. at 2826–27).

The evidence of racial gerrymandering in the present cases is overwhelming. From

the genesis of the "dream plan" of thirty-two black-majority seats in the House, to the endorsement of the plan by the Black Caucus, the Republicans, and the Department of Justice; the formation of a coalition to bring the plan to a vote; the use of Department of Justice's letter of May 2, 1994 as a directive for creating additional districts and the location of such districts; the lack of any analysis of compactness, communities of interest, or contiguity; the presentation of the bill by Representative Beatty, who mentioned race as the only factor for drawing the lines; the testimony of the witnesses as to the purpose of the bill; the insistence on minimum racial percentages in certain districts; the elimination of "phantom districts"; the numerous calls and conferences with Department of Justice attorneys; and the bizarre shape of many of the districts all point directly to race as the predominant factor in the creation of House Districts 12, 54, 82, 91, 103, and 121. The Senate's acquiescence in and overriding desire to comply with Department of Justice's demands for two additional majority BVAP districts and its efforts to achieve racial proportionality in the number of black Senate seats made race the predominant factor in the creation of the three challenged Senate districts, one of which is white and the other two, majority black.

In addition to the direct evidence of the intention of the legislature to draw "safe" majority-minority districts, which evidence came from the testimony of various members of the General Assembly, we have a plethora of circumstantial evidence. This includes the bizarre shape of many districts, which have appendages, tentacles, and abnormal protrusions reaching out for the sole purpose of encircling areas of minority voters. Normal redistricting principles were abandoned in the effort to draw majority-minority districts. Counties, cities, towns, and precincts (VTDs) were split in such a way as to achieve the desired racial result. Minority areas were joined by narrow land bridges to increase black population percentages, and little concern was given to the traditional factors of compactness, contiguity, and communities of interest. Black population was considered to be fungible. If a district needed more black citizens to reach the goal of 55% BVAP, it mattered little where they came from. This is the very evil condemned in *Shaw, Miller,* and *Bush.* The state may not assume that all members of a race think alike, have the same interests, or support the same political candidates.

The above factors have been cited as evidence of racial line drawing by the Supreme Court and all are present in these two cases. They are: using land bridges in a deliberate attempt to bring black population into a district (*Miller*); use of sophisticated computers with block-by-block racial data (*Bush*); evidence of demographer's (Ruoff) purpose in drawing the challenged lines (*Shaw* and *Miller*); creation of new, non-compact and oddly shaped districts beyond those necessary to avoid retrogression (*Miller* and *Shaw*); creation of districts that exhibit disregard for city limits, local election precincts, and voting tabulation districts (*Bush*); districts that wind "in snakelike fashion" until enough black neighborhoods are included to create a black-majority district (*Shaw I*); establishment of a fixed percentage of minority population with a district (57% to 58% in South Carolina) to establish a safe black district (*Bush*); evidence that race or percentage of race could not be compromised (*Shaw II*); statements by legislators indicating that race was the predominant factor in creating the challenged districts (*Miller*); and statements made in the submission for preclearance to the Department of Justice that its purpose was to comply with the dictates of the Department's rejection letter (*Shaw II*).

■ We are aware that the good faith of the state legislature must be presumed until the claimant overcomes such presumption. *Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 318–19, 98 S.Ct. 2733, 2762–63, 57 L.Ed.2d 750 (1978). We are also aware of the "complex interplay of forces that enter a legislature's redistricting calculus," *Miller,* —— U.S. at ——, 115 S.Ct. at 2488; and we are ready to concede that redistricting may be the most difficult task a legislative body ever undertakes. This may explain why so many reapportionment controversies are presented to the courts, where they demand more than Solomonic wisdom in an effort to reach a just result.

■ We do not question the good faith of the legislature in adopting the House plan in 1994. The members did what they thought was required by the law and by the Department of Justice at the time. The same is true of the adoption of the Senate plan in May 1995. Both plans were enacted before *Miller, Shaw II,* and *Bush* came down. However, the good faith of the legislature does not excuse or cure the constitutional violation of separating voters according to race.

The Department of Justice in the present case, as it had done in *Miller,* misunderstood its role under the preclearance provisions of the Voting Rights Act. Here, Department of Justice attorneys became advocates for the coalition that was seeking to maximize the number of majority BVAP districts in an effort to achieve proportionality. These attorneys sought to force the House to come up with the "dream plan" of thirty-two majority-minority districts, and the Senate to create two additional districts with at least 55% BVAP. The documents obtained from the Department of Justice establish that its attorneys were in constant communication with persons representing the Black Caucus, the NAACP, and the ACLU and joined with these special interest groups in drawing additional districts with no other consideration but race. At the request of these groups, the Department of Justice issued its May 2, 1994 objection letter one day before a status conference called by the *Burton* court, and the Department hurried its review of the challenged plan for the House. The Department also issued its compliance letter on May 31, 1994, the day before the *Burton* court was to impose its own plan, because Department of Justice had been advised the court's plan would not create as many majority-minority districts as the House. It is obvious that the Voting Rights Section of the Department of Justice misunderstands its role in the reapportionment process.

■ Both the House and the Senate have denied that race was the predominant factor in drawing any of the districts, and both bodies have sought to defend their actions under a strict scrutiny analysis. On this issue, the House and Senate have the burden

of production of evidence, but the plaintiffs retain the ultimate burden of proof to persuade the court that the proffered justification is not compelling or that the plan is not narrowly tailored to further it. *Shaw v. Hunt,* 861 F.Supp. 408, 436 (E.D.N.C.1994), *rev'd on other grounds,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996).

In *Shaw II,* the Supreme Court stated that drawing of racial distinctions is "permissible where a governmental body is pursuing a 'compelling state interest,'" but "'the means chosen to accomplish the state's asserted purpose must be specifically and narrowly framed to accomplish that purpose.'" —— U.S. at ——, 116 S.Ct. at 1902 (quoting *Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 280, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986)). In *Shaw II,* North Carolina sought to prove three compelling state interests to sustain its contested congressional district: (1) to eradicate the effects of past and present discrimination; (2) to comply with section 5 of the Voting Rights Act; and (3) to comply with section 2 of the Act.

■ *Shaw II* teaches that to be a compelling interest, past discrimination must be specifically identified, and a generalized assertion of past discrimination is not sufficient. "[A]n effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw II,* —— U.S. at ——, 116 S.Ct. at 1903. However, there is a "significant state interest in eradicating the effects of past discrimination." *Shaw I,* 509 U.S. at 656, 113 S.Ct. at 2831.

The evidence in the House case is overwhelming that the reason for creating six of the challenged majority-minority districts was to put the "dream plan" in place and to comply with the dictates of the Department of Justice as expressed in its letter of May 2, 1994. There is not evidence that the General Assembly was motivated by a desire to remedy past discrimination against minorities.

The Supreme Court has left open the question of whether compliance with the Voting Rights Act is a compelling state interest. *See Shaw I* and *Miller, supra.* However, the Court has made clear that the Department of Justice's interpretations of the Act should be

accorded no deference and that "Department of Justice [has] expanded its authority under the statute beyond what Congress intended and we have upheld." *Miller*, —— U.S. at ——, 115 S.Ct. at 2493. In *Miller*, the Court held:

·Section 5 was directed at preventing a particular set of invidious practices which had the effect of "undo[ing] or defeat[ing] the rights recently won by nonwhite voters." H.R.Rep. No. 91–397, p. 8 (1969). As we explained in.*Beer v. United States,*

Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory.... Congress ·therefore decided, as the Supreme Court held it could, "to shift the advantage of time and inertia from the perpetuators of the evil to its victim," by "freezing election procedures ·in the covered areas unless the changes can be shown to be nondiscriminatory."

*Miller*, —— U.S. at ——, 115 S.Ct. at 2493 (quoting *Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (internal quotation omitted)).

In *Beer* the Court found the purpose of section 5 was to ensure that there was no change that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.

"[U]nder strict scrutiny, [a] State must have convincing evidence that remedial action is necessary before implementing affirmative action." *Miller*, —— U.S. at ——, 115 S.Ct. at 2490. *Miller* also teaches that a state does not have a

compelling interest in complying with whatever preclearance mandates the Justice Department issues. When a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination, we do not accept the gov-

ernment's mere assertion that the remedial action is required. Rather, we insist on a strong· basis in evidence of the harm being remedied.

*Id.* at ——; 115 S.Ct. at 2491.

The *Miller* court held that the Justice Department's maximization policy is far removed from the purpose of section 5.

■ Even if one assumes that compliance with the Voting Rights Act is a compelling state interest, the state's action in drawing the lines of House Districts 12, 54, 82, 91, 103, and 121 and Senate Districts 29, 34, and 37 cannot withstand strict scrutiny. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, —— U.S. at ——, 115 S.Ct. at 2490. The history of this redistricting process, as set forth above, and the bizarre configuration of the districts reflect that the legislation was not narrowly tailored.

■ The state contends that these new districts were necessary to comply with the Voting Rights Act and obtain clearance under section 5 thereof. This reading of the law is incorrect. The purpose of section 5 review has been explained above and it does not require maximization; it is intended to prevent retrogression. In *Shaw I*, the Court stated: "A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." 509 U.S. at 655, 113 S.Ct. at 2831. In the present circumstances, the state did not need to establish nine new majority-minority House districts or two additional Senate majority-minority districts to avoid retrogression and to obtain section 5 approval. As to retrogression, the parties argued that the *Burton* court plan should be the benchmark. However, that plan was set aside by the Supreme Court, and any benchmark for the House or the Senate should be the last plan that was legally adopted by the General Assembly that has not been set aside by the court or superseded by action of the General Assembly that has not been altered by the court.

The state claims that it was seeking to be fair to minority citizens in creating the challenged majority-minority districts and attempting to cure past discriminatory practices, which required it to use race as the predominant factor in creating the challenged House and Senate districts. However, a plan seeking to ameliorate past discrimination does not require super-safe majority-minority districts of at least 55% BVAP to accomplish this purpose. Such districts should be narrowly tailored so that each district is considered individually and lines are drawn so as to achieve a district where minority citizens have an equal chance of electing the candidate of their choice. Districts in which most minority citizens register and vote will not need 55% BVAP to elect a candidate of choice. To be narrowly tailored, such facts should be considered when district lines are drawn. This was not done in the present cases because of the insistence that all majority-minority districts have at least 55% BVAP with no evidence as to registration or voter turnout.

■ The state also contends that it was required to create these additional districts to avoid violation of section 2 of the Voting Rights Act. Even so, it is still necessary for the state to narrowly tailor the remedy when race is employed in drawing the lines. To prove a section 2 violation, a minority group must prove that it "is sufficiently large and geographically compact to constitute a majority in a single-member district"; that the minority group is "politically cohesive"; and that the "white majority votes sufficiently as a block to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–2767, 92 L.Ed.2d 25 (1986). Here again, the districts at issue are not geographically compact, and many of the minority pockets of populations do not naturally occur but must be brought in by use of land bridges, tentacles, and appendages reaching out from the core of the district. There has been no showing that creation of the challenged districts was necessary to comply with section 2.

The Senate claims that it had a bipartisan, biracial reapportionment committee made up of fair minded and experienced members from all parts of the state. We do not doubt this, but the evidence is clear that the Reapportionment Subcommittee delegated to its staff (Attorney Couick and Clerk of the Senate Caggiano) the responsibility of drawing the district lines. These two men were seeking proportionality, because they thought this was required by *De Grandy,* and they were seeking the approval of the Department of Justice without further conflict. They felt this could best be obtained by creating two more majority-BVAP districts. To accomplish these purposes, they subordinated traditional redistricting principles to race in drawing the district lines. The Senators did not consider communities of interest because they said that Clerk Caggiano had lived in South Carolina all of his life and knew where such communities were. This is not a sufficient basis for a finding on this element. In addition, Caggiano is a relatively young man and demonstrated no special knowledge of communities of interest in any area of South Carolina.

Neither the House nor the Senate were able to meet the strict scrutiny test as to any of the challenged districts.

### Summary

In summary, for the foregoing reasons, the court holds that nine of the twelve challenged electoral districts for the South Carolina General Assembly are unconstitutional. Of the nine House of Representative districts challenged in *Able et al. v. Wilkins et al.,* C/A No. 3:96–0003–0, six districts—Districts 12, 54, 82, 91, 103, and 121—were drawn with race as the predominant factor. The three remaining challenged House districts—Districts 41, 76, and 118—present no constitutional deficiencies. Of the three Senate districts challenged in *Smith et al. v. Beasley et al.,* C/A No. 3:95–3235–0, all—Districts 29, 34, and 37—were drawn with race as the predominant factor.

None of the suspect districts in either the House or the Senate can survive strict scrutiny. The State has failed to prove that the districts at issue were specifically drawn to achieve a compelling state interest in remedying the effects of past or present discrimi-

nation. Furthermore, assuming that compliance with section 2 or section 5 of the Voting Rights Act is a compelling state interest, the challenged districts were not narrowly tailored to remedy any potential section 2 violation or to avoid retrogression as prohibited by section 5. Thus, these electoral districts violate the Equal Protection Clause of the Fourteenth Amendment, as interpreted by the Supreme Court in *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), and *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

The court's Findings of Fact and Conclusions of Law with respect to the House case are unanimous; with respect to the Senate case, Judge Perry has indicated his intention to file a separate, dissenting opinion.

### *Remedy*

Having found that the six House districts and three Senate districts discussed above violate the Equal Protection Clause, the court must now address the appropriate remedy to impose. Plaintiffs in both cases seek to have this court enjoin the use of the current districting plans for the upcoming elections for the General Assembly and to have the court either impose its own remedial redistricting plan or order the General Assembly to enact a valid, constitutional redistricting plan that is not based predominantly on race.

The court's consideration of this issue is guided by the United States Supreme Court's decision in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Reynolds,* the Court stated:

[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in *Baker v. Carr,* [369 U.S. 186, 250, 82 S.Ct. 691, 727, 7 L.Ed.2d 663 (1962),] "any relief accorded can be fashioned in the light of well-known principles of equity."

377 U.S. at 585, 84 S.Ct. at 1393–94. In deciding the appropriate relief to order in this case, the court must also be aware of the powerful concerns for comity involved in interfering with the state's legislative responsibilities. As the Supreme Court has repeatedly recognized,

redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt. When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.

*Wise v. Lipscomb,* 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). *See also Reynolds,* 377 U.S. at 586, 84 S.Ct. at 1394 ("[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and ... judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.").

■ With these considerations in mind, the court has determined that general principles of equity dictate that the elections for both houses of the South Carolina General Assembly should proceed as scheduled under the challenged districting plans. This case squarely presents the "unusual" case referred to by the *Reynolds* Court in which the competing interests of the state weigh heavily against Plaintiffs' equal protection rights. Delaying the elections or attempting to put into place an interim districting plan would wreak unnecessary havoc on the state's election process. The general election is certainly imminent, roughly six weeks away, and the state's election machinery is already in place. The primary elections were held as scheduled in June because this court declined to enter a preliminary injunction to delay the state's electoral cycle. Candidates have already spent significant time and money campaigning, and voters have begun to familiarize themselves with the candidates. Delaying the elections would cause significant confusion among voters.

If the court were to enjoin the general election to allow more time for the creation of new districts, the court could not limit the intrusion to the six unconstitutional House districts and three unconstitutional Senate districts. Any interim remedy would have to apply to all members of the General Assembly—124 Representatives and 46 Senators—because the court could not accurately predict how repairing the unconstitutional districts would alter the boundary lines of the surrounding districts. Equity dictates that the entire election process should not be disturbed at this late a date to remedy fewer than 5% of the House districts (6 of 124) and fewer than 7% of the Senate districts (3 of 46). Courts have repeatedly allowed elections to proceed under unconstitutional apportionment plans when faced with circumstances such as those present in this case. *See, e.g., Upham v. Seamon*, 456 U.S. 37, 44,

102 S.Ct. 1518, 1522–23, 71 L.Ed.2d 725 (1982) ("[W]e have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements."); *Kilgarlin v. Hill*, 386 U.S. 120, 121, 87 S.Ct. 820, 821, 17 L.Ed.2d 771 (1967) (affirming district court's decision to allow state legislative elections to proceed even though districting plan was "constitutionally infirm in certain respects"); *Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971).

■ On the other hand, the court recognizes that individuals in the infirm districts whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a constitutional apportionment plan. *See Cosner v. Dalton*, 522 F.Supp. 350, 364 (E.D.Va.1981). Therefore, we will require that new districts for both the House and Senate be drawn during the next legislative session of the South Carolina General Assembly to remedy the unconstitutional districts. In the House and Senate districts that are altered by the remedial districting plan, legislators elected in the 1996 general election will serve for only one year. Special elections must be held in 1997 to elect Representatives and Senators to serve the balance of the terms in the amended districts. In accordance with well-established precedent that the state should have the first opportunity to create a constitutional redistricting plan, *e.g., Wise v. Lipscomb*, 437 U.S. at 539–40, 98 S.Ct. at 2496–97, the court will allow the General Assembly until April 1, 1997 to enact a remedial districting plan and have it precleared by the United States Department of Justice as required by the section 5 of the Voting Rights Act.[16] If

---

16. Certainly, the South Carolina General Assembly has had several opportunities to enact a constitutional redistricting plan in the wake of the 1990 federal census. As discussed above, the legislature's failure to enact a plan gave rise to the *Burton v. Sheheen* litigation. In addition, after the Supreme Court vacated the *Burton* court's order, the legislature had another oppor-

tunity to try to enact a valid plan. Thereafter, the House passed H.4333, which was objected to by the Justice Department. The legislature's third attempt in the House and second attempt in the Senate is the subject of the instant lawsuit.

However, all of these prior plans were passed before the Supreme Court's decisions in *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132

the legislature fails to pass a constitutional redistricting plan, the court will discharge its unwelcome obligation to put its own remedial plan into effect. The General Assembly should also establish a proposed schedule for the election cycle of the special elections, including dates for candidate qualifying, primary elections, run-offs, and the special elections.

IT IS, THEREFORE, ORDERED:

1. That the 1996 primary elections already held for the House of Representatives, including Districts 12, 54, 82, 91, 103, and 121, and for the Senate, including Districts 29, 34, and 37, are hereby validated. The 1996 general election for those offices shall proceed as scheduled under state law to elect members under the existing redistricting plan;

2. That the State of South Carolina is hereby enjoined from conducting any elections subsequent to 1996 for the office of Representative from the six unconstitutional House districts identified above, and for the office of Senator from the three unconstitutional Senate districts identified above;

3. That the matter of providing a redistricting plan for the post–1996 House and Senate elections to remedy the constitutional

violations found in this case is referred to the South Carolina General Assembly for exercise of its primary jurisdiction. *See Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2496–97, 57 L.Ed.2d 411 (1978). The South Carolina General Assembly should exercise this jurisdiction as expeditiously as possible by adopting a redistricting plan, and obtaining preclearance of such plan by the Department of Justice under section 5 of the Voting Rights Act. The court will retain jurisdiction of this matter, and if the General Assembly fails to adopt a plan and have it precleared prior to April 1, 1997, this court will discharge its obligation to develop and put into effect an appropriate remedial plan; and

4. Representatives or Senators elected in 1996 to districts that are altered by the final remedial plan approved by the court will serve only one year, and special elections will be held in 1997 to fill the remainder of the terms in those districts. The General Assembly shall establish a proposed election schedule for such special elections in the affected districts.

IT IS SO ORDERED.

A dissenting opinion by Judge Perry will be filed in due course.

L.Ed.2d 762 (1995), *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), and *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). Now that the General Assembly and the Department of Justice have the benefit of these decisions, the legislature should be given another opportunity to attempt to pass, and have precleared, a valid redistricting plan.

APPENDIX A

Appendix A --- House District 12

Appendix B -- House District 41

SERIES: FC96
PANEL: H41
PLAN: H94

House Districts
Act 415 of 1994

APPENDIX C

Appendix C --- House District 54

SERIES: FC90
PANEL: H54
PLAN: H94

House Districts
Act 415 of 1994

County Boundary
District Boundary
Plans Boundary
SC US Highways
Interstate Highways

APPENDIX E

Appendix E -- House District 82

Appendix F -- House District 91

APPENDIX G

Appendix G -- House District 103

Appendix H -- House District 118

SERIES: FC96
PANEL: H118
PLAN: H94

House Districts
Act 415 of 1994

HANAHAN

NORTH CHARLESTON

County Boundary
District Boundary
Place Boundary
SC, US Highways
Interstate Highways

APPENDIX I

Appendix I -- House District 121

Appendix J -- Senate District 29

SERIES: FC96
PANEL: S29
PLAN: S95

Senate Districts
Act 49 of 1995

APPENDIX K

## JUDGMENT

● **Decision by Court.** This action came to trial before the convened three judge Court consisting of the Honorable Robert F. Chapman, Senior United States Circuit Judge, the

Honorable Joseph F. Anderson, Jr., United States District Judge, and the Honorable Matthew J. Perry, Senior United States District Judge. The issues have been tried and a decision has been rendered. Pursuant to the orders filed September 23, 1996 and September 27, 1996,

*IT IS ORDERED AND ADJUDGED*

that House of Representatives Districts 12, 54, 82, 91, 103, and 121 and Senate Districts 29, 34, and 37 are unconstitutional;

That the primary elections already held for the House of Representatives, including District 12, 54, 82, 91, 103, and 121, and for the Senate, including Districts 29, 34, and 37, are hereby validated. The 1996 general election for those offices shall proceed as scheduled under state law to elect members under the existing redistricting plan;

That the State of South Carolina is hereby enjoined from conduction any elections subsequent to 1996 for the office of Representative from the six unconstitutional House districts identified above, and for the office of Senator from the three unconstitutional Senate districts identified above;

The matter of providing redistricting plan for post–1996 House and Senate elections is referred to the South Carolina General Assembly for exercise of its primary jurisdiction. The court will retain jurisdiction of this matter and if the General Assembly fails to adopt a plan and have it precleared prior to April 1, 1997, court will develop and put into effect appropriate remedial plan;

Representatives or Senators elected in 1996 to districts that are altered by final remedial plan approved by the court will serve only one year, and special elections will be held in 1997 to fill the remainder of the terms in those districts. The General Assembly shall establish a proposed election schedule for such special elections in the affected districts.